**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

FOUR WINDS BEHAVIORAL
HEALTH,

        Plaintiff,

        v.                               Civ. No. 19-212 SCY/LF

UNITED STATES OF AMERICA,

        Defendant.

## MEMORANDUM OPINION AND ORDER DENYING FOUR WINDS' MOTION FOR ADDITIONAL DISCOVERY AND DENYING UNITED STATES' MOTION FOR SUMMARY JUDGMENT[1]

In administrative proceedings, Defendant United States concluded that Plaintiff Four Winds Behavioral Health (a residential substance abuse treatment facility) was allowing individuals to exchange food stamps for cash in its retail store. Such behavior is called "trafficking" and violates the rules of the food stamps program. The agency relied on evidence that Plaintiff's store saw an unusually high number of same-cents transactions (transactions ending in 00 cents or 50 cents); repetitive transactions from the same household account within unusually short time frames; unusually high-dollar value purchases for a small convenience/ grocery store; and a total cost of purchased inventory that, assuming a markup of 64%, did not match the total cost of sold inventory. The agency permanently disqualified Plaintiff from participating in the food stamps program. Plaintiff now appeals from that decision.

The relevant statute provides for de novo review of the agency's decision in federal district court. The Court finds that, at this stage of the case when all reasonable inferences must

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 25, 26, 29 & 31.

be drawn in Plaintiff's favor, the undisputed material facts are not sufficient to establish trafficking violations in Plaintiff's retail store. The United States does not have direct evidence of trafficking, and while its facts support an inference that trafficking has occurred, it is not the only reasonable inference that can be drawn from the undisputed facts. Because all reasonable inferences must be drawn in favor of the non-moving party, the Court DENIES the United States' motion for summary judgment.

## BACKGROUND

A.    The Supplemental Nutrition Assistance Program

The Food and Nutrition Services ("FNS") of the United States Department of Agriculture ("USDA") is charged with administering the Supplemental Nutrition Assistance Program ("SNAP"). Doc. 55-1 ¶ 1 (Declaration of Gilda Torres, Section Chief of Retailer Operations and Compliance in the Investigative Analysis Branch of FNS). SNAP provides eligible households with monetary benefits (colloquially known as food stamps) to purchase eligible food items at authorized retail food stores. *Id.* ¶ 5. SNAP uses Electronic Benefit Transfer ("EBT") cards, which operate similarly to debit cards. *Id.* ¶ 6. Stores are prohibited from accepting EBT benefits as payment for ineligible items, such as non-food items. *Id.* ¶ 9; 7 C.F.R. § 278.2(a). Stores are also prohibited from exchanging EBT benefits for cash, regardless of whether the store discounts the benefits. Torres Decl. ¶ 10; 7 C.F.R. §§ 271.2, 278.2(a). These prohibited behaviors are defined as trafficking. Torres Decl. ¶ 11; 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 271.2.

FNS routinely monitors EBT transactions of stores that accept SNAP benefits to detect trafficking. Every transaction made with an EBT card is stored in a national database called the Anti-Fraud Locator using EBT Retailer Transactions ("ALERT"). Torres Decl. ¶ 15. ALERT stores the date, time, and amount of each transaction and the store and household identification numbers involved in the transaction. *Id.* Using the ALERT system, FNS can identify EBT

transactions within a given period of time that fall within certain patterns that are statistically unusual and suggest transactions that are in violation of SNAP. *Id.* ¶¶ 16, 17.

      B.    <u>Four Winds Behavioral Health</u>

      Plaintiff Four Winds Behavioral Health, located in Sandoval County, New Mexico, is a 72-bed residential for-profit substance abuse treatment facility where clients live on-site for up to six months and do not leave. United States' Undisputed Material Fact ("UMF")[2] No. 1. Plaintiff provides all its clients' meals, and clients are not allowed to bring in outside food products. Clients do not have adequate space to store food inside their rooms, only a small refrigerator. *Id.* Plaintiff operates a small convenience store to make available supplemental food and snacks to its residents. UMF No. 2.

      On April 17, 2018, an FNS contractor conducted a store visit at Plaintiff's facility to observe the nature and scope of its operation, stock, and facilities. UMF No. 3. According to his observations, the retail store is open Monday through Friday from 3:00 p.m. to 7:00 p.m., for a total of 20 hours per week. UMF No. 4. The retail area at the store is approximately 64 square feet.[3] The store has a small, cluttered checkout counter. UMF No. 5. It has no shopping baskets

---

[2] The United States' Undisputed Material Facts are set forth in Defendant's Motion For Summary Judgment, Doc. 55 at 4-10, each accompanied by a citation or citations to the record. In its Response to the United States' Motion for Summary Judgment, Doc. 60, Plaintiff does not dispute any of these facts, cite to any record evidence, or in any way comply with Local Rule 56.1(b). Therefore, unless internally inconsistent, all the United States' facts are deemed undisputed.

[3] Although both parties agree that the store is 64 square feet, FNS wrote in its initial report that the store "is approximately 1,684 square feet within public view with 36 square out of public view." AR 92. A later report explains, however, that the 1684 square feet "takes into account 1,620 square feet of seating area consisting of 10 tables with 74 chairs." AR 299. In other words, the 64 square feet describes the area where items are displayed and purchased, but does not include storage areas or seating areas.

or carts available for customer use. *Id.* The store's inventory is characteristic of a convenience store. UMF No. 6. Candy, chips, and soft drinks make up a large portion of its inventory. *Id.* None of its SNAP-eligible items cost more than $5.00; most cost less than $2.50. UMF No. 7. The contractor did not observe any unusual price structures, such as most product prices ending with $.00, during the store visit. UMF No. 8. While the store is open to the public as well as residents, there is no signage outside of the facility that would alert the public to the existence of the store inside the facility. UMF No. 9.

      C.    <u>Suspicious Transactions at the Retail Store</u>

Transactions FNS considers suspicious and indicative of trafficking include (a) multiple withdrawals by the same household account in unusually short timeframes (violators often engage in multiple transactions to avoid suspicious single high-dollar transactions); (b) excessively large purchases from small retailers, like convenience stores, that are not equipped with scanning devices or shopping carts, have limited counter space, and lack sufficient inventory to support such purchases; and (c) a high percentage of transactions ending in same-cents values, like $.00 or $.50, which appear contrived because they do not reflect the random data patterns created by real purchases. UMF No. 11.

Plaintiff appeared on the EBT ALERT system as having met patterns for a small grocery store consistent with EBT trafficking violations. UMF No. 10. As a result, FNS undertook a close analysis of the EBT transaction records at Plaintiff's store from January to May 2018. *Id.* The total transaction dollar volume during the review period was $50,031.52, while the average for small grocery stores—most of which are open more than 20 hours per week—in Sandoval County was $34,172.48. UMF No. 12. The total transaction count during the review period was 2,922, whereas the average for small grocery stores in Sandoval County was 1,871. UMF No. 13.

The average transaction amount in Sandoval County for small grocery stores was $18.27, whereas Plaintiff's store conducted transactions as high as $239.30. UMF No. 14.

There are nine stores, including two superstores, within a one-mile radius of Plaintiff's facility. UMF No. 15. There are fifty-three comparably or better stocked retailers within nine miles of the facility. *Id.* Households engaged in suspicious transactions at Plaintiff's store were also shopping at larger and better stocked stores during the same time period, sometimes on the same day. UMF No. 16. Some of these households were conducting transactions at Plaintiff's store followed within minutes or hours by transactions at stores hundreds of miles away. *Id.*

D.   <u>Administrative Proceedings</u>

On July 2, 2018, FNS issued Plaintiff a charge letter charging trafficking and included three attachments identifying the unusual transactions. UMF No. 17. The letter provided Plaintiff with an opportunity to challenge FNS' findings. *Id.* Specifically, the letter warned that "[i]f it is determined that your firm committed the trafficking violations noted above, it will be permanently disqualified" from SNAP. UMF No. 18. The letter advised Plaintiff that it could request consideration of a civil money penalty in lieu of permanent disqualification, but such a request must be submitted within ten calendar days. *Id.* If no request was timely received, the letter advised that Plaintiff would lose its right for any further consideration for a monetary penalty. *Id.*

On Attachment 1 to the charge letter, FNS identified 1,167 discrete instances of transactions ending in 00 cents or 50 cents, totaling $26,518.00. UNM No. 19. Same-cents transactions comprised approximately 64% of SNAP transactions over $9.00 during the review period. *Id.*

On Attachment 2, FNS identified 57 sets of repeat transactions by individual SNAP households within a set time frame of roughly 24 hours, totaling $7,064.05. UMF No. 20. For

example, Household *8951 made a $45.80 purchase, followed by an $84.75 purchase fourteen minutes later. *Id.* Household *5181 made a $56.50 purchase, followed by a $20.50 purchase four minutes later. *Id.* Household *0316 bought $126.25 from Plaintiff's limited inventory, then purchased another $40.00 worth of items thirty-six minutes later. *Id.* Every transaction in these sets ranged from $20.00 to $239.30. *Id.* The majority of the combined purchases in these sets totaled more than $100, with the largest household expenditure being a set of four purchases totaling $340.85 in just over twenty-four hours. *Id.* The secondary or subsequent transaction amounts ranged from $20.00 to $84.75. UMF No. 21. In a portion of the sets of repeat transactions identified on Attachment 2, the secondary transaction amount or combined subsequent transaction amounts exceeded the initial transaction amount. *Id.* Some households appeared multiple times on Attachment 2. *Id.*

On Attachment 3, FNS identified 59 "excessively large purchase transactions," totaling $5,597.30. UMF No. 22. These transactions ranged from $66.50 to $239.30, with 19 transactions over $100. *Id.* Some households appeared on all three attachments. UMF No. 23.

In letters dated July 9, July 11, and August 20, and in a phone call on August 16, 2018, Plaintiff responded to the charge letter and denied the trafficking charges. UMF No. 24. In its response, Plaintiff explained that the same-cents transactions were a result of its simple pricing structure, adopted for the ease of its store clerks. *Id.* Plaintiff indicated that the repeat transactions reflected its clients returning to make additional purchases that they may not have had time to make. *Id.* Plaintiff explained that the excessively large transactions were due to clients indulging after being incarcerated or homeless, or waiting to make a lot of purchases when the store is restocked weekly. *Id.* Plaintiff also explained that its clients live on property, do not leave, and are not allowed to bring in outside food and beverages. *Id.*

Plaintiff submitted store receipts for merchandise purchased by Plaintiff from approximately January 20, 2018 to May 20, 2018, showing the purchase of $23,183.60 in SNAP-eligible food items. UMF No. 26. The receipts reflected significant purchases of inventory from the Dollar Store, which uses same-cents pricing. *Id.* Allowing for a 64% markup, the invoices submitted establish an inventory that would support $38,020.00 in SNAP transaction activity. UMF No. 27. Yet, during the review period, Plaintiff's store had $50,031.52 in SNAP redemptions of benefits. UMF No. 28.

FNS recommended permanent disqualification. UMF No. 29. FNS did not consider rendering a monetary penalty because Plaintiff did not request one. *Id.* On September 5, 2018, the USDA sent Plaintiff a determination letter informing Plaintiff that it was permanently disqualified from participating in SNAP. UMF No. 30. In a letter dated September 12, 2018, Plaintiff requested an administrative review of the permanent disqualification by the agency's Chief Administrative Review Branch. UMF No. 31. Plaintiff also requested a monetary penalty in lieu of disqualification and submitted additional information for review by FNS. *Id.* This information included three letters from the store owners, three letters from managers, two affidavits from employees, and a SNAP training checklist. UMF No. 32. All documents are dated after the July 2, 2017 charge letter. *Id.* Plaintiff submitted photographs, inventory purchase receipts, its price list, and a sample of EBT and non-EBT transaction totals. UMF No. 33. It also submitted a letter from a client who used SNAP benefits at the store. *Id.*

Plaintiff did not provide itemized cash register receipts for the items purchased in the suspicious transactions. UMF No. 34. Plaintiff provided a price list, which demonstrates that most, but not all, SNAP-eligible items are priced in 25-cent increments. UMF No. 35. Examples that are not so priced include string cheese at $0.55; ramen at $0.40; Splenda at $0.10; and

Fireball candy at $0.15. *Id.* A sample of the first 100 non-EBT transaction totals over $9.00 provided by Plaintiff exhibited significantly lower percentages of same-cents transactions when compared to the percentage of same-cents transactions in Attachment 1. UMF No. 36.

On November 5, 2018, FNS issued a Final Agency Decision rejecting Plaintiff's arguments and affirming the permanent disqualification penalty. UMF No. 37. The Final Agency Decision concluded that the "transaction data and overall firm record demonstrate the patterns of unusual, irregular, and inexplicable SNAP activity for this firm is likely the result of trafficking." UMF No. 38. It determined that Plaintiff "provided inadequate explanations for the suspicious transactions and insufficient evidence to legitimize its transaction data." *Id.* It concluded that Plaintiff was not eligible for a monetary penalty, observing that Plaintiff did not timely submit documentation of its eligibility and did not submit contemporaneous evidence demonstrating that its training and compliance program existed prior to the trafficking charge. UMF No. 39. The decision was signed by Administrative Review Officer ("ARO") Rich Proulx. Administrative Record ("AR") 655 (Doc. 54).

      E.    <u>Procedural History</u>

Plaintiff filed its Complaint in the District Court for the District of Columbia on December 3, 2018. Doc. 1. The United States served the Administrative Record on Plaintiff on February 25, 2019 (but did not file it with the Court at that time). Doc. 19 at 1. The parties agreed to transfer the case to this district, and the case was transferred on March 13. Docs. 21 & 22. Plaintiff filed an Amended Complaint on May 8. Doc. 35. The parties conducted a Rule 26(f) meet and confer on June 14. Doc. 40 at 1. Magistrate Judge Fashing held a scheduling conference on July 2. Doc. 41. Following the scheduling conference, Judge Fashing assigned the case to a standard 120-day track, with a discovery deadline of October 30 and a pretrial motions deadline of December 2. Doc. 42. The parties exchanged discovery. *See* Docs. 44, 47, 48, & 49.

On October 30, the parties jointly requested an extension of scheduling order deadlines. Doc. 51.
Judge Fashing granted that request and extended the discovery deadline to November 29 and the
pretrial motions deadline to January 2, 2020. Doc. 53.

The United States duly filed the Administrative Record and its Motion for Summary
Judgment on January 2, 2020. Docs. 54 & 55. Plaintiff filed its response in opposition on
February 21, Doc. 60, and the United States filed a Reply on March 5, Doc. 62. Meanwhile,
Plaintiff filed a separate motion entitled "Four Winds [sic] Request For A Scheduling
Conference." Doc. 61. The Court construes this as a request under Federal Rule of Civil
Procedure 56(d), as the motion requests additional discovery regarding the credentials of the
agency decisionmaker (ARO Proulx) and the process by which the decision took place, and
argues that the motion for summary judgment is "not ripe for adjudication on the present record."
*Id.* at 1. The United States responded in opposition on March 31, Doc. 64, and Plaintiff filed a
reply on April 6, Doc. 67.

Subsequently, Plaintiff submitted a series of miscellaneous filings: "Opposed Reduction
Of The Ambit Of Doc. 67," filed April 22 (Doc. 68); "Notice of Filing(s) in the District of
Columbia," filed April 27 (Doc. 69); and an email dated April 28, 2020 (Doc. 70). The last of
these submissions narrows Plaintiff's additional requested discovery to "basic information about
Proulx's credentials." Doc. 70. The United States responded to these collective filings on May 5.
Doc. 71. The United States accurately characterized these filings as unauthorized surreplies filed
without leave of court; further, it continued to oppose any request to reopen discovery. *Id.*

After the United States filed this response, Plaintiff filed: "Unopposed Four Winds [sic] Final Submission Regarding (a) *De Novo* Review and (b) Bandimere/Lucia Issues"[4] on May 26 (Doc. 73); "Errata" on May 27 (Doc. 74); "Four Winds [sic] Notice Of United States Supreme Court Ruling Regarding Significance Of Lucia/Bandimere Issues And Request For Scheduling Trial De Novo" on June 12 (Doc. 76); "Four Winds [sic] Request for Expedited Trial *De Novo*" on June 13 (Doc. 77); and "*Ex Parte* But Unopposed Request For Telephone Conference" on June 23, which, despite its name, was served on the United States via the CM ECF system (Doc. 78). Setting aside the issue of whether Plaintiff permissibly filed any of these documents, the Court notes that the content of these documents is largely repetitive of previous filings and arguments Plaintiff has made.

The Court held a hearing on the United States' Motion for Summary Judgment on July 8, 2020. Doc. 80. At the hearing, Plaintiff indicated that its miscellaneous filings contain two additional requests for relief: a request to hold a trial de novo and a request to obtain further information regarding ARO Proulx. For the reasons explained below, the motion to hold a trial de novo is moot because the Court denies the United States' motion for summary judgment. The Court will set a status conference to discuss setting a date for the trial de novo. Because Plaintiff did not avail itself of the opportunity to obtain information regarding ARO Proulx during the discovery period, Plaintiff's belated request to obtain that discovery now is denied.

---

[4] The United States filed a Notice of Clarification in response to this document, explaining that the document was "unopposed" only in the sense that the United States had not objected to Plaintiff's request for additional time to file it. Doc. 75. But the United States "continues to oppose Plaintiff's substantive arguments and request for relief," and "opposes the filing of a pre-trial memorandum or additional briefing on its Motion for Summary Judgment." *Id.*

**DISCUSSION**

I.      **Plaintiff's Rule 56(d) Motion**

Although Plaintiff does not ever mention Federal Rule of Civil Procedure 56(d), it filed a "Request For A Scheduling Conference" in which it requested additional discovery and argued that the motion for summary judgment is not ripe for decision without the additional discovery. Doc. 61 at 1. Rule 56(d) permits a party opposing summary judgment to request that the Court defer a ruling on the motion in the absence of necessary discovery. Rule 56(d) requires the nonmovant to "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The Tenth Circuit has explained that the party requesting additional discovery must identify "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (internal quotation marks and alterations omitted).

Plaintiff has not made a sufficient showing to avoid summary judgment through application of this rule. First, it has not submitted an affidavit or declaration with its motion attesting to the relevant facts. More importantly, the motion fails to set forth any information with respect to parts 2, 3, and 4 of the Rule 56(d) test. Plaintiff fails to explain why the required facts are missing, what steps have been taken to obtain the missing facts, and how additional time will enable it to uncover those facts.

Plaintiff has known of ARO Rich Proulx's identity for many years. Plaintiff apparently drafted a list of "written questions" for ARO Proulx in November 2017. *See* Doc. 68 at 2. The United States served the Administrative Record on Plaintiff on February 25, 2019, which contained ARO Proulx's letters and decisions. Doc. 19. Plaintiff listed ARO Proulx as a witness

in the Joint Status Report filed June 25, 2019. Doc. 40 at 7. Pursuant to the scheduling orders entered in this case, Plaintiff had a total of 168 days in 2019 (from the June 14 Rule 26(f) meet and confer to the close of discovery on November 29) to request written discovery regarding ARO Proulx and to depose him. Plaintiff's written questions from November 2017 could have been submitted during this period as formal discovery requests. Nowhere in Plaintiff's motion or its subsequent miscellaneous filings does Plaintiff explain why it failed to seek this discovery during the lengthy period available to do so. Plaintiff's lack of diligence during the discovery period cannot justify its request to defer a decision on the United States' timely motion for summary judgment.

Plaintiff relies on a district court decision allowing discovery in *Betesfa, Inc. v. United States*, 410 F. Supp. 3d 132 (D.D.C. 2019). *See* Doc. 67 at 6 & Doc. 67-3 (attaching a copy of the decision). In that case, the court denied the United States' motion to dismiss the plaintiffs' complaint seeking review of a SNAP disqualification decision. *Betesfa*, 410 F. Supp. 3d at 140-41. Among other things, the court determined that the plaintiffs were entitled to discovery on the "the comparators that FNS used and the methodology it employed." *Id.* at 141. The case is distinguishable from the present case in several respects. First, the discovery *Betesfa* allowed is not the type of discovery Plaintiff requests in this case as Plaintiff here is not seeking information about comparators or the agency's methodology. Doc. 61 at 1. More importantly, the decision in *Betesfa* was issued early in the case—before the parties had the opportunity to conduct any discovery at all. *Id.* at 133-34. Plaintiff in this case had five and a half months to conduct discovery. Plaintiff does not explain why that discovery period was inadequate to permit it to seek and obtain all the information necessary to "develop and to present [its] case on the merits." *Cf. id.* at 141.

Therefore, the Court denies the Request For A Scheduling Conference (Doc. 61) and takes up the United States' Motion for Summary Judgment.

## II.     United States' Motion For Summary Judgment

### A.     Summary judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

### B.     Standard of review of the agency decision

Under the relevant statutory and regulatory scheme, review of an FNS decision to disqualify a SNAP retailer is both administrative and judicial. 7 U.S.C. § 2023(a). First, upon receipt of the written notice of its initial decision, the retailer may ask FNS to review the initial decision. 7 C.F.R. § 279.2. Upon completion of the review, FNS renders a final determination

and notifies the retailer. 7 C.F.R. § 279.5. "[W]ithin thirty days after the date of delivery or service of the final notice of determination upon it," the retailer may file a complaint in district court "requesting the court to set aside such determination." 7 U.S.C. § 2023(a)(13).

"The suit in the United States district court or State court shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue . . . ." *Id.* § 2023(a)(15). Although review of the disqualification decision is de novo, the agency's choice of sanctions is subject to arbitrary and capricious review. *Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 820 (10th Cir. 1991); *Joudeh v. United States*, 783 F.2d 176, 178 (10th Cir. 1986). As the First Circuit has explained: "If the court upholds the agency's finding of a violation, the court's only remaining task is to examine the sanction imposed in light of the administrative record to judge whether the agency properly applied its regulations, *i.e.*, whether the sanction is warranted in law or without justification in fact." *Broad St. Food Mkt. v. United States*, 720 F.2d 717, 720 (1st Cir. 1983) (internal quotation marks and alterations omitted). Other courts have described this as a "bifurcated review standard." *Colorado v. United States*, No. 07-cv-936, 2008 WL 2690710, at *2 (D. Colo. July 2, 2008).

The Tenth Circuit has not provided guidance on how the de novo trial should be conducted in federal court. Other circuits have explained that a "trial de novo is a trial which is not limited to the administrative record—the plaintiff may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997) (internal quotation marks omitted); *see also Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009); *Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir. 1975) ("By rejecting the substantial evidence standard of review in the

Food Stamp Program and permitting a trial de novo, Congress intended nothing more than that the district court would not be bound by the administrative record.").

The circuits have also held that the burden of proof is "placed upon the store owner to prove by a preponderance of the evidence that the violations did not occur." *Kim*, 121 F.3d at 1272; *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir. 1986); *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991); *Goodman v. United States*, 518 F.2d 505, 507 (5th Cir. 1975). As *Redmond*, a Fifth Circuit case Plaintiff relies on extensively (Doc. 67 at 4-5), explained:

> [B]y requiring the aggrieved store to file a complaint in the district court requesting the court to set aside the agency determination, the Act casts the burden of being the plaintiff on the aggrieved store with all of the usual responsibilities of a plaintiff in obtaining relief from a court, including the burden of proving facts to show that he is entitled to relief. In other words, the agency action stands, unless the plaintiff proves that it should be set aside. He may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency, and the agency itself may offer any evidence available to support its action, whether or not in the administrative record. But unless proven to be invalid, the agency action prevails.

507 F.2d at 1011-12. Plaintiff argues that this standard is unfair and "insurmountable," Doc. 60 at 6, but provides no authority interpreting the mandate of 7 U.S.C. § 2023(a)(15) in any other way. The Court finds this case law to be the most reasonable interpretation of the statutory directive that district courts conduct a de novo trial.

Because the statute requires permanent disqualification "on the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store," 7 U.S.C. § 2021(b)(3)(B), other courts have held that "it is Plaintiff's burden to raise material issues of fact as to *each* of the transactions set forth as suspicious by the FNS." *Kahin v. United States*, 101 F. Supp. 2d 1299,

1303 (S.D. Cal. 2000) (emphasis added); *see also McClain's Mkt. v. United States*, 214 F. App'x

502, 505 (6th Cir. 2006) (same).

C.      Drawing all reasonable inferences in the light most favorable to Plaintiff and
        considering the evidence established through on-site investigations, inconsistent
        redemption data, and transaction reports, a reasonable factfinder could determine
        that no trafficking violation occurred.

The Court generally agrees with the United States' recitation of the law and, except

where internally inconsistent,[5] accepts the United States' undisputed version of the facts noting

that Plaintiff never submitted a competing version of facts. Accepting these facts, the Court must

determine what reasonable inferences can be drawn from them. The United States asks the Court

to draw from these facts the same inference ARO Proulx drew in the administrative proceedings;

namely one can infer from the data that Plaintiff committed SNAP violations.[6] But, unlike the

government during its administrative proceedings, the Court at this point must draw all

---

[5] For instance, the United States asserts in UMF No. 1 that Plaintiff's clients "live on-site for up
to six months and do not leave" and "are not allowed to bring in outside food products." The
United States points out in UMF No. 15, however, that there are numerous "better stocked
retailers" nearby and notes in UMF No. 16 that "[h]ouseholds engaged in suspicious transactions
at Four Winds were also shopping at larger and better stocked stores during the same time period
. . . ." The United States' purpose of asserting UMF Nos. 15 and 16 is to argue that (despite
saying in UMF No. 1 that Four Winds residents do not leave the facility and are not allowed to
take food into their rooms from other stores), Four Winds residents can and do shop at nearby
stores. To the extent the United States sets forth internally inconsistent facts, the Court resolves
the inconsistency in favor of Plaintiff, the non-moving party. Further, if the facts can be read in a
way that makes them consistent, absent a good reason, the Court will read them in a way that
makes them consistent. Here, UMF No. 1 can be read consistently with UMF Nos. 15 and 16 if
the household member shopping at other stores is a different person than the Four Winds'
resident. If someone other than the Four Winds resident is shopping at these other stores,
however, the materiality of UMF Nos. 15 and 16 is questionable.

[6] Notably, the governing statute specifically permits the government to make its findings based
on inferences. 7 U.S.C. § 2021(a)(2) (FNS may base a trafficking determination on "evidence
that may include facts established through on-site investigations, inconsistent redemption data, or
evidence obtained through a transaction report under an electronic benefit transfer system"); *see
also* 7 C.F.R. § 278.6(a) (implementing regulation).

reasonable inferences in favor of Plaintiff, the nonmoving party. This is true even when Plaintiff presents no facts of its own. *See Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (even when there is no response, a district court "cannot grant summary judgment unless the moving party has met its initial burden of production under Rule 56 and demonstrated that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law").

True, as the United States correctly points out, "a moving party may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Doc. 55 at 10. But the record does not lack evidence. In addition to the undisputed material facts, before the Court is the administrative record from the proceedings below, including evidence Plaintiff presented during the administrative proceedings. While the Court will not scour the record or engage in forensic accounting in an effort to make Plaintiff's case for it, the Court must view the facts before it and draw all reasonable inferences in favor of Plaintiff, even if it was not Plaintiff who presented those facts. The Court thus engages in this process for the four bases Defendant relies on in support of its summary judgment motion: Plaintiff's store had (i) an unusually high number of same-cents transactions; (ii) repetitive transactions from the same account within unusually short time frames; (iii) unusually high-dollar value purchases for a small convenience store; and (iv) purchased insufficient inventory to justify its reported sales. Drawing all reasonable inferences in favor of Plaintiff, the facts reasonably could support a conclusion that the statistical anomalies the United States relies on is the product of the Four Winds store's unique status as the only store in a residential treatment center rather than the product of trafficking.

i.   Same-cents transactions

FNS identified 1,167 discrete instances of transactions at Plaintiff's store ending in 00 cents or 50 cents, totaling $26,518.00. UMF No. 19. Same-cents transactions comprised

approximately 64% of SNAP transactions over $9.00 during the review period. *Id.* Numerous same-cents value transactions are suspect given that, statistically, the tabulation of random item prices in different sale transactions should result in a fairly random distribution of totals. UMF No. 11. Plaintiff explained that the same-cents transactions were a result of its simple pricing structure, adopted for the ease of its store clerks. UMF No. 24. Plaintiff also contended that it made purchases from the Dollar Store, which itself uses same-cents pricing. UMF Nos. 25, 26. The agency originally accepted this explanation, and withdrew the allegation related to Attachment 1. AR 297.

The price list for items sold at Plaintiff's store is contained in the record at AR 433 through AR 531, with approximately 10 items listed on each of these pages. A review of this price list demonstrates that most of the items sold end in a same-cents number (.50 or .00). And, most of the items that are not same-cents instead end in .25 or .75, numbers that frequently add up to something ending in .50 or .00 when more than one item is purchased. Finally, a handful of items exist that end in some other number but, even these few items end with a 0 or 5 (such as .05, .40, or 2.20). Thus, even if these few items are part of a customer's purchase, they are more likely to add up to a number ending in .50 or .00 than if these items ended in numbers such as .07 or .13. In other words, due to its pricing structure, Plaintiff's store had no need of pennies.

Even though most of the EBT-eligible items Plaintiff's store sells are priced in same-cents, as the United States points out, it only takes one non-same-cents item in a bundle of items purchased to make the final transaction price non-same-cents. But this fact has limited value without knowing how often non-same-cents items were purchased compared to same-cents items. Undisputed material fact number six states that candy, chips, and soft drinks make up a large portion of Plaintiff's store's inventory. UMF No. 6. These items typically have same-cents

pricing. Thus, a reasonable inference can be drawn that most of the store's EBT transactions end in same-cents pricing because most of the store's EBT-eligible inventory (candy, chips, and soft drinks) is priced in same-cents. Although, one non-same-cents item, like ramen, when purchased with several candy bars and sodas could make the overall transaction non-same-cents, the Court has no information about how frequently non-same-cents items like ramen were purchased. It only knows from the undisputed material facts that candy, chips, and soft drinks make up most of the store's inventory and that those items are same-cents. Based on the fact that most of the store's inventory is priced in same-cents, a reasonable factfinder could find it unsurprising that most of the stores EBT transactions were also same-cents.

At the hearing, however, the United States explained that the data in Attachment 1 does not stand alone. The government explained that, at the second-level agency review process, it looked beyond Attachment 1 and, based on that analysis, maintained its initial assessment that the high frequency of same-cents transactions was indicative of fraud. The government acknowledged that most, but not all, items the store sold were priced in same-cents increments. UMF No. 35. However, upon further analysis, the government observed that EBT transactions exhibited higher rates of same-cents transactions than non-EBT transactions. UMF No. 36. This is suspicious, the government argues, because no apparent legitimate reason exists for the discrepancy.

The Court's task is to consider the facts before it and then determine whether, drawing all reasonable inferences in favor of Plaintiff, a reasonable factfinder could find in Plaintiff's favor. The government states that "[a] sample of the first 100 non-EBT transaction totals over $9.00 provided by Four Winds exhibited significantly lower percentages of same-cents transactions when compared to the percentage of same-cents transactions in Attachment 1," but does not

explain what it means by "significant." Looking at just the first two full pages of the transaction

sheet, for transactions over $9.00,[7] there were 3 same-cents and 4 non-same-cents EBT

transactions and 1 same-cents and 0 non-same-cents non-EBT transactions, AR 534-35.

Although the first two pages of the transaction sheet provides too small a sample size to draw an

inference for either party, this cursory glance indicates that no discrepancy is immediately

apparent. The Court does not doubt that a review of the first 100 EBT transactions in an amount

of over $9.00 yields a discrepancy with non-EBT transactions that the United States considers

significant. But, what the Court considers significant (particularly when drawing all inferences in

favor of Plaintiff) and what the United States considers significant might differ.

On a de novo review, the Court must reach its own conclusions and it cannot conclude a

number is significant without knowing the value of the number. Further, although the Court must

engage in a de novo review, the Court is not obligated to do what neither party has done: engage

in a statistical analysis of the more than 1,000 transactions listed.[8] Nor will the Court repeat the

government's analysis of the first 100 EBT transactions to learn the numbers the United States

relied on in concluding the discrepancy was significant. On a de novo review, without having

any statistical information before it about the raw data, the Court cannot conclude that the

difference is significant enough to draw an inference of trafficking.  In other words, without

knowing the extent of this discrepancy between EBT and non-EBT transactions, the Court

---

[7] The government does not explain why it choose to look at transactions over $9.00 ($10.00 seems to be a more obvious choice).

[8] The raw data is in the Administrative Record, spanning from AR 533 to AR 630, but the Court is not a forensic accountant and will not analyze the data in its own spreadsheet to determine if it agrees the discrepancy is "significant."

cannot say at this point that the discrepancy is enough to overcome what a reasonable factfinder might otherwise conclude based on Plaintiff's evidence of its same-cents pricing structure.

Further, this discrepancy is only relevant if it is based on a comparison of apples to apples rather than a comparison of apples to oranges. For instance, it may be that EBT-eligible items tend to use a same-cents pricing structure more than non-EBT-eligible items. Although Plaintiff carries the burden of proof, it is the United States that is asking the Court to ascribe meaning to the discrepancy between EBT transactions and non-EBT transactions. Without knowing whether non-EBT-eligible items have a same-cents pricing structure almost identical to non-EBT-eligible items, the Court can attach only limited value to any discrepancy.

The government's argument that it does not have the burden of proof and that Plaintiff has presented no evidence fails to recognize that, although Plaintiff did not present its own undisputed material facts in the briefs, it did present evidence during the administrative process. And, the government's undisputed material facts incorporate much of this evidence.

The government further points out, and the Court agrees, that it can prevail on summary judgment by demonstrating a lack of evidence to support an element Plaintiff must prove. That Plaintiff has presented no evidence since the administrative process, however, does not mean the government automatically wins. "[A]lthough a district court may consider a motion for summary judgment uncontested for lack of a timely response, it cannot grant summary judgment unless the moving party has met its initial burden of production under Rule 56 and demonstrated that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003).

Here, genuine issues of material fact do exist. Plaintiff says it did not commit any SNAP violations. *E.g.*, AR 167. The United States disagrees. Resolution of this factual dispute will be

decided based on inferences that can be drawn from the record, including evidence Plaintiff presented below. Based on the undisputed fact that Plaintiff's store primarily used same-cents pricing, a reasonable factfinder could conclude that the high rate of same-cents transactions at Plaintiff's store is the product of its pricing structure, not the product of trafficking.

ii.    Repetitive transactions from the same account within unusually short time frames

FNS identified 57 sets of repeat transactions at Plaintiff's store by individual SNAP households within a set time frame of roughly 24 hours, totaling $7,064.05. UMF No. 20. Every transaction in these sets ranged from $20.00 to $239.30. *Id.* In a portion of the sets of repeat transactions, the secondary transaction amount or combined subsequent transaction amounts exceeded the initial transaction amount. *Id.* Some households appeared multiple times. *Id.* According to the government, the timing and large-dollar amounts of these purchases suggest deliberate behavior to break up large purchases to avoid the detection of single, high-dollar trafficking transactions. UMF No. 11. On the other hand, Plaintiff argued that the repeat transactions reflected its clients returning to make additional purchases that they may not have had time to make initially. UMF No. 24. Plaintiff also explained to the agency that its clients live on property, do not leave, and are not allowed to bring in outside food and beverages. *Id.*[9] The Court further notes that there are no shopping baskets in the store and that the residents only live a few feet from the store. Although the government points to the lack of shopping baskets in support of its argument that customers are unlikely to actually purchase large quantities of items from the store (an argument addressed in more detail below), the lack of shopping baskets or

---

[9] There is conflicting evidence as to whether residents actually leave the facility or not. But on summary judgment, the United States submitted as an undisputed material fact the allegation that "residents do not leave." UMF No. 1. At trial, the United States or Plaintiff is free to submit additional evidence to clarify this matter.

bags also provides a reason why Plaintiff's residents would make multiple trips between their rooms and the store.

The undisputed facts are that numerous store customers engaged in multiple transactions at the store over a short period of time. One inference to be drawn from this is the one the United States champions: the multiple transactions demonstrate an intent to break up transactions to disguise the use of an EBT card to obtain cash rather than food. Another, however, is that Plaintiff's single-household residents cannot shop anywhere else, have an incentive to exhaust their SNAP benefits at the one place where they can shop and, because there are no bags or shopping carts in which to carry their purchases, sometimes make repeat trips between the store and their rooms. This latter inference is not unreasonable and so, at the summary judgment stage, must be drawn in favor of Plaintiff.

In addition, the government points out that households conducting transactions at Plaintiff's store also frequently spent SNAP benefits at larger and better-stocked grocery stores. UMF No. 16. Nothing in the record, however, explains what a "household" is or how SNAP benefits work for households. Where a household has more than one member, one would expect Plaintiff's residents to use SNAP benefits at the only store available—Plaintiff's store—while other household members shop elsewhere. Indeed, evidence in the record demonstrates that "[s]ome of these households were conducting transactions at Four Winds followed within minutes or hours by transactions at stores hundreds of miles [a]way." UMF No. 16. This indicates that the households described in UMF No. 16 are multiple-person households and that the person in the household shopping at Plaintiff's store is not the same person in the household shopping elsewhere.

In contrast to multiple-person households, where a household's only member is a Four Winds resident who cannot leave the facility, one would expect that person exclusively to use his or her SNAP benefits at the Four Winds store (perhaps through frequent transactions). Again, although the record does not say, a reasonable inference is that the "households" described in UMF No. 20 primarily consist of households of one that exclusively (and so repeatedly) shop at the Four Winds store.[10]

Further, accepting the government's theory that Plaintiff's residents can shop at other less expensive nearby stores, and so would not rationally choose to use most of their benefits at the more expensive store in Plaintiff's facility, would require the Court to reject the government's first undisputed material fact: "Four Winds is a 72-bed residential for-profit substance abuse treatment facility where clients live on-site for up to six months and do not leave . . . and clients are not allowed to bring in outside food products." UMF No. 1. As set forth above, drawing all reasonable inferences in favor of Plaintiff, the Court concludes that Plaintiff's residents did not shop elsewhere (although another member of the household might have). Drawing all reasonable inferences in favor of Plaintiff, an innocent reasonable explanation exists for repetitive purchases from Plaintiff's store during a short time frame—the store is the only place a single-household resident can shop. Similarly, the fact that benefits for one account were used at both Plaintiff's store and other stores has an innocent reasonable explanation—one member of the household on the account shopped at Plaintiff's store while other members of the household on the account shopped at other stores.

---

[10] The record does indicate that "[s]ome households appeared on all three attachments." UMF No. 23 (same-cents, repeat, and excessively large transaction data). This undisputed material fact, however, provides too little information and context to affect the Court's analysis.

        iii.    <u>Unusually high-dollar value purchases</u>

The third set of data that United States cites as demonstrating fraud is what it views as unusually high-dollar purchases for a small convenience store. FNS identified 59 "excessively large purchase transactions," totaling $5,597.30. UMF No. 22. These transactions ranged from $66.50 to $239.30, with 19 transactions over $100. *Id.* Plaintiff explained that the excessively large transactions were due to clients indulging after being incarcerated or homeless or waiting to purchase items when the store is restocked weekly. UMF No. 24. The government argues that most of the SNAP-eligible items at Plaintiff's store cost less than $2.50. UMF No. 7. A customer could binge, or stock up for the week for fear of shortages, purchasing 25 such items (without the benefit of a shopping basket) and still not be included in this list of large transactions. And *none* of the SNAP-eligible items cost more than $5.00, UMF No. 7, meaning that a customer would have to buy 14 of the most expensive SNAP-eligible items in the store (again without a shopping basket) in order to make this list. Moreover, several households who made repeat or high-dollar value transactions also consistently made transactions ending in a same-cents value, making these transactions exhibiting multiple patterns of trafficking even more suspicious. UMF No. 23.

The undisputed material facts, however, state that Plaintiff's residents can only shop at Plaintiff's store. Thus, a resident in Plaintiff's facility, who is in a single-person household and wishes to exhaust his or her monthly SNAP benefits, must use all the monthly benefits he or she receives at Plaintiff's store. This puts Plaintiff's store in a different position than convenience stores that must compete with other nearby stores. Plaintiff's store is also different than most convenience stores in that it is only open four hours a day for five days a week. A reasonable inference can be drawn that single-household residents who wish to exhaust their benefits each month and have only limited hours to purchase items at Plaintiff's store (with a special incentive to horde on Friday afternoons or when the store is restocked) might purchase more items than a

customer not in a residential treatment center who can shop at more than just one store and who can do so at almost any time of day or night.

Granted, as the government pointed out, Plaintiff's residents do not need to spend as much money on groceries as the typical SNAP beneficiary because they are already receiving meals as part of their residence at Plaintiff's facility. Doc. 55 at 18. Nonetheless, one could still reasonably infer that SNAP beneficiaries typically would prefer to use all their credits every month rather than have those credits build up or expire.[11] Thus, one reasonable inference to be drawn from the undisputed facts is that single-person households who have a certain amount of SNAP benefits available to them per month, and who are not permitted to leave Plaintiff's facility, would tend to use their benefits at the only place they can—Plaintiff's retail store.

### iv.   Inventory purchased that is insufficient to justify reported sales

Finally, the government argues that the inventory Plaintiff purchased cannot justify the sales it reported. Plaintiff submitted store receipts for merchandise purchased for its shop from approximately January 20, 2018 to May 20, 2018, showing the purchase of $23,183.60 in SNAP-eligible food items. UMF No. 26. These receipts reflected significant purchases of inventory from the Dollar Store, which uses same-cents pricing. *Id.* At a 64% markup, the government points out, these invoices support $38,020.00 in SNAP transaction activity. UMF No. 27. This is approximately $12,000 short of the $50,031.52 in SNAP redemptions during the review period. UMF No. 28.

Importantly, the 64% maximum-possible-average-markup on which the government founds its argument is not a number derived from actual data from Plaintiff's store. Instead, the

---

[11] The record contains no information regarding whether a resident can carry over monthly SNAP benefits or the amount of benefits a single-household beneficiary receives.

government assumes this number based on typical convenience store markup data. The question before the Court, then, is whether a factfinder could reasonably infer from the undisputed material facts that Plaintiff's store marked up its items more than a typical convenience store.

Such an inference is reasonable. Again, rule-following residents in Plaintiff's facility could only shop at Plaintiff's store. This gave Plaintiff's store a monopoly on the items it sold. Moreover, the best way to determine the actual markup is to compare the price for which Plaintiff purchased an item to the price for which Plaintiff sold an item. Again, although the raw data is in the record, neither party performed this comparison even on a random sample of items. Although the Court is not inclined to conduct an in-depth analysis of this raw data in the first instance, the Court did randomly compare a few items to determine if the actual markup of this small random sample was consistent with the 64% markup the government argues is the maximum possible. Plaintiff's store purchased 35 cans of Coca-Cola for $9.98 (AR 207) (29 cents a can) and sold each can for $1.00 (AR 453), which yields a markup of more than 200%. The store purchased 28 12-ounce bottles of Gatorade for $12.88 (AR 215) (46 cents a bottle) and sold each bottle for $1.50 (AR 466-68), again for a markup of more than 200%. It purchased 15 Haagen Dazs bars for $11.98 (AR 208) (80 cents each) and sold them for $1.50 each (AR 470) for a markup of just less than 100%. It purchased 24 Slim Jim bars for $17.48 (AR 206) (73 cents each) and sold them for $1.35 each (AR 509)—a markup of 85%. It bought 48 Snickers bars for $28.56 (AR 271) (60 cents each) and sold them for $1.50 each, for a markup of 150% (AR 511). Yoplait cost $7.98 for a pack of 18 (AR 272) (44 cents each) and sold for 75 cents each (AR 531) for a markup of 70%. It cost the store $12.48 for 17 hot pockets (AR 209) (73 cents each) and the store sold them for $2.50 each (AR 471, 479) for more than a 100% markup.

At the Dollar Store, Plaintiff purchased Jolly Ranchers for $1.00 (AR 186) and sold them for $2.00 (AR 477)—a 100% markup. Similarly, it purchased bottles of Hawaiian Punch at the Dollar Store for $1.00 (AR 182) each and sold the bottles for $2.00 each (AR 472), again for a markup of 100%. It purchased 8 eggs for $1.00 (AR 382) and sold the carton of eggs for $2.50 (AR 434) for a 150% markup.

Although the Court recognizes that its random sample size is small, it is nonetheless notable that all the randomly selected items had a markup greater than what the government argues could be the maximum average markup. Indeed, except for 1 of the 10 items sampled (Yoplait), each item in the sample had a markup significantly more than the markup the government claims is the maximum possible, and on which it relied to infer trafficking. Given the Court's random sampling of the raw data in the record, the Court concludes that, drawing all reasonable inferences in favor of Plaintiff, a reasonable factfinder could conclude that Plaintiff's store marked its items up at an average rate of significantly more than 64%. And, based on this inference, the amount spent on inventory is not inconsistent with the total amount Plaintiff's store sold during the review period.

Again, the United States argues that, because Plaintiff bears the ultimate burden of proof at trial, the United States' burden in this case is simply to point to the absence of evidence supporting Plaintiff's case, and Plaintiff submitted no evidence at all in connection with the present motion for summary judgment. In other words, Plaintiff did not carry its burden to come forward with a genuine issue of material fact to avoid summary judgment as to the grounds the agency relied on for disqualification. As explained above, however, the grounds the agency relied on for disqualification consist of a series of inferences. At the summary judgment stage, the Court must look at the facts before it and draw all reasonable inferences in favor of Plaintiff.

In addition, Plaintiff did submit evidence (along with argument related to that evidence) in the administrative proceedings below. Although it submitted this evidence below, it is still part of the record and so the Court must consider it. In considering competing reasonable inferences that can be drawn from the facts in the record, the Court at this stage must choose those inferences that favor Plaintiff. The Court agrees that, at trial, Plaintiff will bear the ultimate burden to "prove by a preponderance of the evidence that the violations did not occur." *Kim*, 121 F.3d at 1272; *Plaid Pantry Stores*, 799 F.2d at 563; *Warren*, 932 F.2d at 586; *Goodman*, 518 F.2d at 507.

        D.    <u>Plaintiff does not state an Appointments Clause violation.</u>

Plaintiff raises an Appointments Clause challenge, arguing that ARO Proulx did not have constitutional authority to issue the final agency decision. Doc. 60 at 2-3 (citing *Lucia v. SEC*, 138 S. Ct. 2044 (2018); and *Bandimere v. SEC*, 844 F.3d 1168, 1179-80 (10th Cir. 2016)). The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. "The Supreme Court has defined an officer generally as 'any appointee exercising significant authority pursuant to the laws of the United States.'" *Bandimere*, 844 F.3d at 1173 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)). If the official in question does not exercise such authority, he or she is an employee (rather than an inferior officer) and not subject to the Appointments Clause. *Id.*

Although there is no bright-line rule for determining whether an official is an employee or an "inferior Officer" subject to the Clause, *id.* at 1174, the Tenth Circuit has distilled "three

characteristics of inferior officers": (1) the official's position is "established by Law"; (2) "the duties, salary, and means of appointment are specified by statute"; and (3) the official "exercise[s] significant discretion in carrying out important functions." *Id.* at 1179 (quoting *Freytag v. Comm'r of Internal Rev.*, 501 U.S. 868, 881-82 (1991)) (alterations omitted). In *Lucia*, the Supreme Court recently elaborated on the third prong and held that the officials at issue were "inferior officers" in major part because they had "nearly all the tools of federal trial judges." 138 S. Ct. at 2053.

The Court finds the arguments Plaintiff makes in support of its Appointments Clause challenge to be insufficient and, to the extent other arguments might exist that Plaintiff did not make, Plaintiff has waived those arguments due to inadequate briefing. *See Turner Bros., Inc. v. Conley*, 757 F. App'x 697, 700 (10th Cir. 2018) ("Appointments Clause challenges are nonjurisdictional and may be waived or forfeited").[12] Plaintiff does not support its assertion that USDA AROs such as ARO Proulx are inferior officers by presenting arguments under the governing three-part test. Plaintiff does not cite a provision establishing the office of AROs by law; does not identify any statute specifying their duties, salary, or means of appointment; and does not describe the AROs' powers or responsibilities or analyze whether they have "nearly all the tools of federal trial judges." Instead, Plaintiff cites 5 U.S.C. § 3105, which establishes the office of administrative law judges ("ALJs"). Doc. 60 at 2-3; *see also* Doc. 73 at 6 (citing provisions relating to ALJs used by the SEC). But Plaintiff does not establish that this provision

---

[12] Additionally, the Tenth Circuit has held that an Appointments Clause challenge to a Social Security ALJ must be raised in administrative proceedings, or it is forfeited. *Carr v. Comm'r, SSA*, 961 F.3d 1267 (10th Cir. 2020). Much of the Tenth Circuit's reasoning for its holding may apply to the present case. *See id.* at 1273-75. There is no evidence in the administrative record here that an Appointments Clause challenge was raised in proceedings below.

is relevant by explaining how ARO Proulx is an ALJ.[13] Finally, Plaintiff does not explain who appoints AROs (*i.e.*, someone other than the President, a Court of Law, or a Head of Department). In other words, because Plaintiff does not allege who appointed ARO Proulx, it really does not allege the existence of an Appointments Clause violation at all.

Instead, Plaintiff argues that it "needs to depose Rich Proulx and Calvin Thompson to see how they fit the standards set by the Tenth Circuit in *Bandimere* or the rigors required by *Lucia*" and contends that "[t]he only way to determine if ARO Proulx qualifies pursuant to *Bandimere* is for the court to order discovery to take place." Doc. 60 at 6-7; *see also* Doc. 67 at 6 ("The challenge as to Proulx requires much more information than we have at present. At a minimum, we must begin with an understanding as to how the agency appointee earned his place, his authority, his credentials and the manner by which he adjudicated issues presented."); Doc. 73 at 5 ("Further proceedings against Four Winds without this data would violate Four Winds' Due Process rights.").

In addition to the reasons described above for denying Plaintiff's Rule 56(d) request, the Court finds that Plaintiff has not shown good cause for re-opening discovery to seek this information. Under the Federal Rules, "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time." Fed. R. Civ. P. 6(b)(1); *see also* Fed. R. Civ. P. 16(b)(4) (a scheduling order "may be modified only for good cause"). Obtaining additional time under these provisions "requires the moving party to show that it has been

---

[13] Quite the opposite, in fact: the statute consigning the disqualification decision to AROs does not use the term ALJ and does not incorporate 5 U.S.C. § 3105. It says simply that the review is to be conducted by "the person or persons designated by the Secretary." 7 U.S.C. § 2023(a)(5). By contrast, the subsections following (a)(5) do explicitly provide for ALJs appointed under 5 U.S.C. § 3105 to make determinations relating to administrative cost-sharing with states (not retail store disqualification), and they specify various powers and duties of those ALJs. *See* 7 U.S.C. § 2023(a)(6)-(12).

diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006). Plaintiff has had the Administrative Record since February 25, 2019 (*see* Doc. 19), and discovery took place for five and a half months after that (from June 14 to November 29, 2019). Plaintiff offers no explanation for not having sought everything it needed while discovery was permitted. The Court is unaware of any basis in the record for it to find good cause for re-opening discovery; therefore, it denies Plaintiff's discovery request and rejects Plaintiff's Appointments Clause challenge.

E.   The Court rejects the balance of Plaintiff's arguments in opposition to summary judgment.

In addition to raising an Appointments Clause challenge, Plaintiff complains that: Plaintiff was not advised of the in-person FNS contractor visit; the administrative proceedings were ex parte; there was no hearing; there were no witnesses favorable to Plaintiff; the agency blindly accepted statistics; Ms. Torres could give "no details as to what human being at Four Winds did what, when, where and for how much" in her deposition; and when asked to identify a specific culprit, Ms. Torres identified a "theoretically non-existent person." Doc. 60 at 1, 4-6. Plaintiff provides no citation to legal authority or the record for any of these contentions.[14]

Even if Plaintiff had properly developed these arguments, the Tenth Circuit has indicated that de novo review in district court overcomes any objection to the administrative process. *Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 820 (10th Cir. 1991) ("once a participant seeks review de novo, the adequacy of the administrative process as an abstract matter is no longer important" (internal quotation marks omitted)). In *Haskell*, the Tenth Circuit rejected a due

---

[14] Plaintiff cites Ms. Torres' deposition testimony, but does not attach such testimony to its response, and the Court has not otherwise found it in the record.

process argument, holding that because the district court trial is de novo, "the lack of an evidentiary hearing at the administrative level is not a denial of due process." *Id.* Like any other litigant, Plaintiff has procedural rights in federal court which would cure Plaintiff's various complaints about the administrative process. Plaintiff had the right to identify and depose witnesses favorable to it; to demand the precise statistical and comparison evidence the agency relied on; to conduct discovery exploring the agency's decision-making process; and to present evidence explaining each of the alleged trafficking violations. Plaintiff's complaints about the about the administrative process are not relevant at this stage and will not be permitted during a bench trial where the standard is de novo review.

## CONCLUSION

The United States' Motion for Summary Judgment, Doc. 55, is DENIED. Plaintiff's "Request For A Scheduling Conference," Doc. 61, is DENIED. Plaintiff represented during oral argument that the United States' motion for summary judgment and Plaintiff's discovery request are the only matters pending before the Court and the Court does not view Plaintiff's miscellaneous filings (Docs. 68, 69, 70, 73, 74, 76. 77 & 78) as seeking any other relief. Nonetheless, to the extent Plaintiff's miscellaneous filings (Docs. 68, 69, 70, 73, 74, 76. 77 & 78) could be viewed as requesting any relief, that relief is DENIED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE