# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FOUR WINDS BEHAVIORAL
HEALTH,

      Plaintiff,

    v.                            Civ. No. 19-212 SCY/LF

UNITED STATES OF AMERICA,

    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Defendant United States found, in administrative proceedings, that Plaintiff Four Winds Behavioral Health (a residential substance abuse treatment facility) was allowing individuals to exchange food stamps for cash in its retail store. Such behavior is called "trafficking" and violates the rules of the food stamps program. The agency relied on evidence collected between January and May 2018 (the "Review Period") that showed, among other things, the Four Winds store saw an unusually high number of same-cents transactions (transactions ending in 00 cents or 50 cents); repetitive transactions from the same household account within unusually short time frames; and unusually high-dollar value purchases for a small convenience/grocery store. Based on these suspicious transactions and what the agency perceived to be a lack of a satisfactory explanation for them, the agency permanently disqualified Four Winds from participating in the food stamps program. Four Winds appeals from that decision.

      The relevant statute provides for de novo review of the agency's decision in federal district court.[1] Doc. 127. The Court held a bench trial on February 17 and 18, 2021. Doc. 127.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 25, 26, 29 & 31.

After the trial concluded, the parties submitted written closing statements, Docs. 130, 131 & 132, and proposed findings of fact and conclusions of law, Docs. 136 & 138. The Court now enters its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). Because Four Winds failed to meet its burden of demonstrating that transactions the United States identified as indicative of trafficking did not constitute trafficking, the Court affirms the agency's disqualification decision.

## BACKGROUND

A.  The Supplemental Nutrition Assistance Program

The Supplemental Nutrition Assistance Program ("SNAP") provides eligible households with monetary benefits, colloquially known as food stamps, to purchase eligible food items at authorized retail food stores. The purpose of SNAP "is to alleviate hunger and malnutrition in low-income households." 7 U.S.C. § 2011; Doc. 134 at 121:1-3. Benefit recipients use their Electronic Benefit Transfer ("EBT") cards to purchase food items from authorized retailers by swiping their EBT cards at a point of sale device. 7 U.S.C. § 2013(a); 7 C.F.R. § 274.1. Stores are prohibited from accepting EBT cards as payment for ineligible items, such as non-food items. 7 C.F.R. § 278.2(a). Stores are likewise prohibited from exchanging EBT benefits for cash. 7 C.F.R. §§ 271.2, 278.2(a). These prohibited behaviors are defined as trafficking. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 271.2.

The statute requires permanent disqualification on "the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store." 7 U.S.C. § 2021(b)(3)(B). The Food and Nutrition Services ("FNS") of the United States Department of Agriculture ("USDA") is charged with administering SNAP. When an authorized retailer is found to have trafficked in food stamps, permanent disqualification is required unless "substantial evidence" indicates that the store has

"an effective policy and program . . . to prevent violations."[2] 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1).

B.     Administrative Proceedings

On July 2, 2018, FNS issued Four Winds a letter charging trafficking; this letter included three attachments identifying the unusual transactions. AR 129-163; Doc. 134 at 145:1-8. The letter provided Four Winds with an opportunity to challenge FNS's findings. *Id.* Specifically, the letter warned that "[i]f it is determined that your firm committed the trafficking violations noted above, it will be permanently disqualified" from SNAP. AR 129. The letter advised Four Winds that it could request consideration of a civil money penalty in lieu of permanent disqualification, but such a request must be submitted within ten calendar days. *Id.* If no request was timely received, the letter advised that Four Winds would lose its right for any further consideration for a monetary penalty. AR 130.

In letters dated July 9, July 11, and August 20, and in a phone call on August 16, 2018, Four Winds responded to the charge letter and denied the trafficking charges. AR 166-170, 319-39. In its response, Four Winds explained that its same-cents transactions were a result of its simple pricing structure, adopted for the ease of its store clerks. *Id.* Four Winds indicated that the repeat transactions reflected its clients returning to make additional purchases that they may not have had time to make. *Id.* Four Winds explained that the excessively large transactions were due to clients indulging after being incarcerated or homeless, or waiting to make a lot of purchases when the store is restocked weekly. *Id.* Four Winds also explained that its clients live on property, do not leave, and are not allowed to bring in outside food and beverages. *Id.*

---

[2] In proceedings below, FNS determined Four Winds was ineligible for a civil money penalty. AR 316, 654-55. Four Winds has not requested review of this finding, and it is therefore not before the Court. *See* Doc. 35 (Amended Complaint).

Along with its response to the charge letter, Four Winds submitted receipts showing the purchase of $23,183.60 in SNAP-eligible food items purchased from approximately January 20, 2018 to May 20, 2018, and that it claimed it used to stock the store's inventory. AR 171-293. The receipts reflect significant purchases of inventory from the Dollar Store, which uses same-cents pricing. *Id.*

After reviewing Four Winds' submissions, FNS recommended permanent disqualification in an undated memorandum. AR 294-315. FNS did not consider rendering a monetary penalty because Four Winds had not requested one at that time. AR 315. On September 5, 2018, the USDA sent Four Winds a determination letter informing Four Winds that it was permanently disqualified from participating in SNAP. AR 316-17.

In a letter dated September 12, 2018, Four Winds requested an administrative review of the permanent disqualification by the agency's Chief Administrative Review Branch. AR 319-25. Four Winds also requested a monetary penalty in lieu of disqualification and submitted additional information for review by FNS. *Id.* This information included three letters from the store owners, three letters from managers, two affidavits from employees, and a SNAP training checklist. AR 328-37. All documents are dated after the July 2, 2017 charge letter. *Id.* Four Winds submitted photographs, inventory purchase receipts (which were duplicates of the receipts already submitted to FNS), its price list, and a sample of EBT and non-EBT transaction totals. AR 339-630. It also submitted a letter from a client who used SNAP benefits at the store. *Id.* Four Winds did not provide itemized cash register receipts for the items purchased in the suspicious transactions. *See generally* AR 171-293, 350-630. Four Winds provided a price list, which demonstrates that most, but not all, SNAP-eligible items are priced in 25-cent increments. AR 433-531.

On November 5, 2018, FNS issued a Final Agency Decision rejecting Four Winds' arguments and affirming the permanent disqualification penalty. AR 644-55. The Final Agency Decision concluded that the "transaction data and overall firm record demonstrate the patterns of unusual, irregular, and inexplicable SNAP activity for this firm is likely the result of trafficking." AR 653. It determined that Four Winds "provided inadequate explanations for the suspicious transactions and insufficient evidence to legitimize its transaction data." AR 654. It concluded that Four Winds was not eligible for a monetary penalty, observing that Four Winds did not timely submit documentation of its eligibility and did not submit contemporaneous evidence demonstrating that its training and compliance program existed prior to the trafficking charge. AR 654-55. Administrative Review Officer ("ARO") Rich Proulx signed the decision. AR 655.

**FINDINGS OF FACT**

A.      Evidentiary Rulings

FNS looks for potential trafficking through its Antifraud Locator Using EBT Retailer Transactions ("ALERT") system. Doc. 134 at 121:10-24. The ALERT system stores the date, time, and amount of each transaction, as well as the store and household identification numbers involved in EBT transactions. *Id.* at 123:5-14. EBT transaction data is captured contemporaneously with each sale. *Id.* at 122:17-20. Each household's EBT account stores electronic data, to include: demographics, benefits, transaction, and balance data for each individual household. 7 C.F.R. § 271.2. States must maintain highly accurate systems for recording that data, allowing for only two errors per 10,000 transactions, *see* 7 C.F.R. § 274.8(b)(2)(ii), and transmit the data regularly to FNS, where it is monitored through the ALERT system. By law, FNS may rely on EBT data to disqualify a store for trafficking. 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 274.8(a)(3)(vi)-(viii); 7 C.F.R. § 278.6(a). Using the ALERT system, FNS identifies EBT transactions within a given time that fall within certain patterns that

are statistically unusual and suggest transactions that are in violation of SNAP. Doc. 134 at 121:22-24, 123:15-24.

FNS used data from the ALERT system as the foundation for its charges against Four Winds. Specifically, on July 2, 2018, FNS issued Four Winds a Charge Letter, charging Four Winds with trafficking. AR 129-131. In three attachments to this letter, based on data from the ALERT system, FNS identified transactions it deemed unusual and, therefore, suspicious (the "Suspect Transactions"). AR 129-163; Doc. 134 at 145:1-8. The three attachments to the July 2, 2018 Charge Letter are included in the record as Appendix 1, Appendix 2, and Appendix 3.

On Attachment 1 to the charge letter, FNS identified 1,167 discrete instances of transactions ending in 00 cents or 50 cents, totaling $26,518.00. AR 132-53.

On Attachment 2, FNS identified 57 sets of repeat transactions by individual SNAP households within a set time frame of roughly 24 hours, totaling $7,064.05. AR 154-61. For example, Household *8951 made a $45.80 purchase, followed by an $84.75 purchase fourteen minutes later. *Id.* Household *5181 made a $56.50 purchase, followed by a $20.50 purchase four minutes later. *Id.* Household *0316 bought $126.25 from Four Winds' limited inventory, then purchased another $40.00 worth of items thirty-six minutes later. *Id.* Every transaction in these sets ranged from $20.00 to $239.30. *Id.* The majority of the combined purchases in these sets totaled more than $100, with the largest household expenditure being a set of four purchases totaling $340.85 in just over twenty-four hours. *Id.* The secondary or subsequent transaction amounts ranged from $20.00 to $84.75. *Id*. In a portion of the sets of repeat transactions identified on Attachment 2, the secondary transaction amount or combined subsequent transaction amounts exceeded the initial transaction amount. *Id.* Some households appeared multiple times on Attachment 2. *Id.*

On Attachment 3, FNS identified 59 "excessively large purchase transactions," totaling $5,597.30. AR 162-63. These transactions ranged from $66.50 to $239.30, with 19 transactions over $100. *Id.* Some households appeared on all three attachments. AR 132-63.

Prior to and during trial, the parties stipulated and the Court ruled that the Administrative Record is admissible for relevance, foundation, and authentication purposes. Doc. 134 at 188:16-17 (trial); Doc. 140 at 71:5-73:8 (pretrial conference). At trial, the Court stated, and both parties agreed, that the data in the Appendices is admissible for the truth of the matter asserted because it is "data" rather than an out-of-court statement. Doc. 134 at 183:25-184:9, 188:10-17.[3] Accordingly, the Court admitted the evidence in the Appendices at trial as evidence of transactions that took place at the Four Winds store during the relevant time period. *Id.* at 184:7-9, 190:12-14.

In response to FNS's charge letter, Four Winds provided data of its own. It submitted receipts showing the purchase of $23,183.60 in SNAP-eligible food items it purchased from approximately January 20, 2018 to May 20, 2018. AR 171-293. Four Winds also submitted a price list of items sold and an inventory of the store. AR 433-531. This price list shows that most, but not all, SNAP-eligible items are priced in 25-cent increments. Doc. 55 ¶ 35. Because the Administrative Record is admissible for relevance, foundation, and authentication purposes, Doc. 134 at 188:16-17; Doc. 140 at 71:5-73:8, the Court overrules the United States' objections

---

[3] Four Winds' proposed findings of fact and conclusions of law purport to challenge the accuracy of ALERT data. Doc. 138 at 3-4. Four Winds' counsel waived this position at trial: during counsel's motion to strike the FNS letter in the Administrative Record, counsel stated "I have no quarrel with the attachments, that's fine." Doc. 134 at 188:16-17. As explained further below, Four Winds may not raise new issues in its proposed findings that were not raised at trial. Moreover, prior to trial, the Court excluded "arguments about the unfairness of the underlying administrative proceedings or the investigation in connection with the use of the ALERT system, its software programming, or the accuracy of its collected data." Doc. 114 at 2.

to the data in Four Winds' price list (Doc. 136 ¶¶ 90-92), and admits it for the truth of the matter asserted on the same grounds it admitted data from the ALERT system. Except for the appendices and data Four Winds provided, however, information in the administrative record remained subject to objections unrelated to relevance or authentication. Doc. 140 at 71-73.

For instance, the administrative record contains extensive narrative that constitutes inadmissible hearsay statements. Among this inadmissible narrative are self-serving statements that representatives of both parties made during the administrative review. For example, the Court made it clear at trial that it would not automatically accept or defer to the agency's conclusions on whether the evidence demonstrated trafficking. Doc. 134 at 187:12-188:9. Similarly, Four Winds submitted to the agency various letters containing possible explanations for the Suspect Transactions. AR 166-167, 169, 170, 319-325. The parties' arguments do not constitute evidence. Moreover, unless a party repeated an argument as part of the de novo trial, the Court does not consider the argument in issuing its findings of fact and conclusions of law. Finally, included in FNS's main report are photographs its contractor took and sketches drawn of the Four Winds store. AR 31-48, 49-66, 67-87. An FNS contractor conducted three site visits of the Four Winds store. Doc. 140 at 128. In the course of these visits, the reviewer prepared a report containing observations of the store characteristics, took photos, and prepared sketches based on his or her personal observations. The United States argues that these photos and sketches are admissible for the truth of the matter asserted under a hearsay exception for business records. Doc. 131 at 5 n.4. Addressing the photos first, the Court concludes that the photos are not statements at all. To be admissible, the proponent of the photographic only need establish a foundation that the photograph is an accurate representation of the contractors' personal observations at the time of the visit. Fed. R. Evid. 901. As described above, the Administrative

Record was admitted for relevance, foundation, and authentication purposes. Doc. 134 at 188:16-17; Doc. 140 at 71:5-73:8. The photographs contained in it are therefore not subject to foundation or authentication objections. The Court therefore admits them into evidence. Furthermore, Four Winds did not object to these photographs at trial. *See generally* Doc. 134 at 125-144.

The sketches do contain hearsay statements, such as the contractor's statement about the store's dimensions. The Court does not rule on the admissibility of the sketches because the Court does not refer to them in its Findings and Conclusions. The Court notes, however, that Four Winds did not object to these observations, sketches or photos at trial. *See generally* Doc. 134 at 125-144.

B.      Four Winds' Case-in-Chief

Four Winds called three witnesses during its case-in-chief: Gilda Torres, FNS Section Chief; Sheena Bachelor-Evridge, executive director of Four Winds; and Garrett Reincke, Four Winds owner and board member. None of these witnesses had responsibility for the Four Winds store during the Review Period—that responsibility belonged to Gary "Skip" Ritter, who did not testify at trial. Doc. 133 at 139:5-20. Nor did any of the clerks Four Winds hired to work in the convenience store testify at trial. *Id.* at 139:21-140:3.

Ms. Bachelor-Evridge did not indicate when, if ever, she went into the Four Winds store and did not testify that she ever monitored the Four Winds store. Ms. Bachelor-Evridge was "very busy at Four Winds." *Id.* at 120:20-23. She had many responsibilities at Four Winds and managing the store was not one of them. *Id.* at 109:9-23, 110:23-111:23, 113:21-114:3, 115:1-11, 120:24-121:1. Her sole involvement with the store consisted of consultations with people that run the store. *Id.* at 78:11-13. She was unfamiliar with the store to the point that she could not identify the point-of-sale equipment. *Id.* 133 at 144:6-145:2.

Ms. Bachelor-Evridge's testimony was based on her knowledge of the "policies" at Four Winds, rather than the actual practices in the store during the Review Period. *Id.* 133 at 77:9-12, 78:13-15. Further, there was no evidence that these policies were in place during the Review Period because, as Ms. Bachelor-Evridge acknowledged, Four Winds' policies change over time. *Id.* at 136:12-15.

Ms. Bachelor-Evridge testified:

[W]e keep $100 in the cash drawer on a daily basis. And when the store is closed, two individuals count the cash and store purchases are batched out. And then the cash received is deposited into a bank account that same day if possible.

*Id.* at 78:18-22. Further,

There is oversight to counting the cash at night. And there's an ongoing inventory with our merchant account and receipts available to show the items purchases [sic] that are in line with receipts.

*Id.* at 95:25-96:4.

Ms. Bachelor-Evridge did not testify that the amount of cash at the end of the day was compared against an inventory count performed at the end of every day. Ms. Bachelor-Evridge did not testify that the individuals who count the cash compare the amount at the end of every day against the point-of-sale receipts. Ms. Bachelor-Evridge did not testify who "oversees" the cash counting or how they would handle discrepancies such that any discrepancies would have come to Ms. Bachelor-Evridge's attention. And, although Ms. Bachelor-Evridge generally testified that "there's an ongoing inventory with our merchant account and receipts available to show the items purchase[d] . . . are in line with receipts," *id.*, she did not provide details of this reconciling process, who conducted this process, or provide the receipts she claims would show items purchased are in line with items sold. Without this information, Ms. Bachelor-Evridge's testimony fails to show that trafficking did not, or was unlikely to, occur at the Four Winds store.

Ms. Bachelor-Evridge testified that "[t]here's a camera in the store that's on all the time. So every purchase is monitored by a video." *Id.* at 96:2-4. Again, however, the most relevant portions of this category of information is missing. Ms. Bachelor-Evridge did not testify that anyone actually looked at the video every day, what they observed if they did, or how long the video recordings remained available. Four Winds did not submit any video evidence of any of the Suspect Transactions showing the actual purchases. Without evidence of the video footage or even testimony that the video footage was ever viewed, evidence that video footage exists is meaningless.

Ms. Bachelor-Evridge testified that she is "not aware of any employee trafficking at Four Winds." *Id.* at 91:12-13. But because she never worked in the store, did not monitor the store, and had no personal knowledge of how the store operated in practice, there is no foundation for a finding that, if trafficking had occurred at the Four Winds store, Ms. Bachelor-Evridge would have been aware of it.

Four Winds' second witness, Mr. Reincke, similarly did not testify as to evidence about how the store operates. He testified to what he was unaware of and attempted to provide argument as to why the underlying administrative findings were invalid (largely argument his counsel could have, but did not, make). In providing testimony about what he was *unaware of* and otherwise presenting argument, Mr. Reincke provided scant affirmative evidence that could be applied to meet Four Winds' burden of proof.

Mr. Reincke did not testify that he had personal knowledge of the Suspect Transactions. Nor would he likely be able to do so, as Mr. Reincke lived in Florida during the Review Period. Doc. 134 at 68:19-24. Mr. Reincke did not indicate how frequently he was at Four Winds during the Review Period. *Id.* at 30:6-9. Mr. Reincke did not indicate when, if ever, he went into or

monitored the store. Mr. Reincke named one Four Winds store clerk, but could not speak to whether anyone else ever "operated that system" (presumably meaning the Clover point-of-sale system). *Id.* at 69:3-12.

Mr. Reincke testified Four Winds has a policy against trafficking food stamps. Doc. 133 at 161:8-10. He stated that policy is monitored by using the "point of sales system," i.e. Clover, and that therefore "we understand what's being purchased." *Id.* at 161:11-14. But Mr. Reincke did not testify who monitored receipts from the point-of-sale system, or how often such monitoring occurred. Mr. Reincke testified that "[w]e do keep a hundred dollars as a baseline number, and then every day, what is above that number gets deposited into a bank account, and the hundred dollars is still there." *Id.* at 161:17-19. Again, Mr. Reincke did not testify that he personally handled cash or oversaw the cash handling, how he knew it was done every day, or how it would have come to his attention if this policy regarding cash was not followed.

Mr. Reincke speculated that a suspicious transaction might be explained if a client did not like a meal and chose to purchase something to eat at the store instead. Doc. 134 at 20:8-10. But Mr. Reincke also testified that, to his knowledge, clients typically eat the meals, *id.* at 33:5-6, and did not testify that he had personal knowledge of any client replacing meals with store purchases.

Mr. Reincke also speculated that clients may not have had time to finish shopping because they "could have simply been called to a do a drug test. Their probation officer could have called them. Their probation officer could have showed up. You know, medical could have called them." *Id.* at 23:5-8. Mr. Reincke never testified that he had personally observed this scenario or that he had personal knowledge it had ever happened, let alone that it happened regularly enough to explain the high-dollar, repetitive transactions.

Mr. Reincke testified that he was not "aware of facts which support the proposition" that trafficking occurred at Four Winds store. *Id.* at 157:12-19. But, as with Ms. Bachelor-Evridge, there is no foundation for the Court to find that, if trafficking had occurred, Mr. Reincke would have been aware of it.

Finally, Mr. Reincke attempted to testify about store receipts from Four Winds' point-of-sale system that he claims would have established the content of the items sold during the high-dollar transactions in question. Doc. 133 at 161-176. Mr. Reincke testified that such information existed, *id.* at 162:23-163:4, but the United States objected to data from Four Winds' point-of-sale system (Clover) being introduced in evidence, as Four Winds had neither provided this data in discovery nor listed it as an exhibit for trial. *Id.* at 162-176. The United States then argued that, without the receipts being in evidence or having been disclosed, Mr. Reincke could not testify about conclusions he drew from the receipts. *Id.* at 171:3-17. Four Winds' counsel stated that he did not intend to elicit such testimony. *Id.* at 173:17-24, 174:14-17, 174:25176:2. When the Court later asked, for clarification purposes, whether Four Winds was moving to admit evidence not previously disclosed in discovery, Four Winds' counsel stated that he was not moving to admit the point-of-sale receipts as evidence or elicit any testimony based on the Clover system. Doc. 134 at 66:9-68:6. Thus, receipts that, if disclosed and listed as exhibits, could have provided support to Four Winds' argument that suspicious transactions were actually legitimate, formed no part of Four Winds' case-in-chief.

Four Winds called Gilda Torres as its last witness. Ms. Torres testified about the administrative investigation and findings and conclusions. Doc. 134 at 73-106. She did not testify about practices at the Four Winds store or present any evidence to rebut the inference of trafficking at Four Winds.

C.     Defendant's Case-in-Chief

Defendant called one witness, Gilda Torres. Ms. Torres testified that the EBT transactions identified in FNS's charge letter were suspicious, described the FNS contractor site visits, summarized the state of the Four Winds store during the site visits, and discussed FNS's subsequent investigation into the Four Winds store. Doc. 134 at 115-204.

**CONCLUSIONS OF LAW**

A.     Introduction

At the administrative proceeding below, FNS determined that Four Winds engaged in trafficking not because it had any direct evidence of trafficking but, rather, because the data underlying the store's sales was atypical and suspicious. But, as the Court pointed out in denying FNS's motion for summary judgment, much of this atypical data might have been explained by the fact that Four Winds is an atypical store. Doc. 81 at 16-26. Unlike a local convenience store, the Four Winds store primarily serves a group of in-house residents who, if they are following Four Winds' rules and not leaving campus, have nowhere else to spend their monthly EBT benefits. As a result, drawing all reasonable factual inferences in favor of Four Winds, the Court concluded that Four Winds might be able demonstrate at trial that the transactions FNS identified as suspicious were actually the product of the unique characteristics of the Four Winds store. The Court further provided examples of the type of accounting that would serve to refute FNS's conclusions and help demonstrate the legitimacy of transactions flagged as suspect. *Id.* at 19-20, 26-28. Four Winds, however, chose not to present this type of evidence at trial. Instead of presenting evidence to meet its burden of proof, Four Winds presented the testimony of three witnesses unfamiliar with the day-to-day operations of its store. Further, it presented no forensic accounting or analysis of the underlying data that is at the heart of this case. The lack of accounting on the underlying data and the dearth of evidence related to specific transactions at

issue make it impossible for the Court to conclude with confidence either that there was or that there was not a pattern of trafficking at the Four Winds store. This lack of evidence means the party who carries the burden of proof—Plaintiff Four Winds—loses.

The United States' primary argument at trial was that the Four Winds store is simply too small and has too little inventory to support the large sales numbers it reports. Doc. 134 at 121 (stores stocked at "minimal" levels); *id.* at 132 (type of stock also "very minimal for a grocery store"); *id.* at 139-40 (freezer stocking minimal); *id.* at 149 (store does not have stock to justify large transactions); *id.* at 152 ($239.30 transaction questionable in part because "the store doesn't even have that amount of stock to be able to justify that amount"); Doc. 131 at 4-9 (closing argument that "Plaintiff operated a tiny, poorly-stocked convenience store where customers conducted large and repetitive transactions using their SNAP benefits"). This argument, however, rests on a shaky foundation.

The undisputed evidence is that Four Winds would start with only $100 cash when it opened its store. The United States' sole witness, Gilda Torres, testified that although the store might start with only $100 cash at the beginning of the day, it will obtain cash as it sells items throughout the day. Doc. 134 at 198-99. Further, she explained that the trafficking alleged is that customers would place a food charge on their EBT card but then not take the food and obtain cash instead. *Id.* at 121. This begs the question: If the store is only starting with $100 but then fraudulently gives away large amounts of cash throughout the day, where does the cash it gives away come from? Ms. Torres testified that the store is not large enough to support the number of transactions reported. But, to obtain an amount of cash sufficient to support the described trafficking, the store would have to engage in the number of transactions FNS said the store's

small size and low inventory would not support.[4] In addition, evidence in the Administrative Record shows that the Four Winds store saw frequent cash transactions during the Review Period. AR 615-30. Thus, Four Winds is correct about one thing. If this were a criminal case where the United States carried the burden of proof, the United States would have failed to meet its burden and Four Winds would be acquitted. But this is not a criminal case and Four Winds, being in control of information it could use to attempt to demonstrate its transactions were legitimate, carries the burden of proof.

Four Winds has done nothing to demonstrate the legitimacy of its transactions. In the administrative proceedings below, Four Winds did provide receipts of large amounts of inventory purchased from the Dollar Store and Sam's Club. But, although it argued in the underlying administrative proceedings that it sold the items described on these receipts at its store, its counsel made no such argument at the de novo trial. Moreover, as the United States correctly points out, not all of the items on these receipts were included on the Four Winds store's inventory and so were not even sold at the store. Doc. 131 at 10-11 ("The receipts include items such as pickles, two 2x3 cork boards, and two 'BI PF HELIX' items priced at $48.84 each, which appear to be vacuums."). Further, some of the items listed on the store's inventory could also be used in Four Wind's kitchen. *Id.* at 11 ("For example, the receipts show purchases for coffee, eggs, bread, peanut butter, and milk"). Other items (like raw eggs) could have *only* been used in the kitchen because residents did not possess the means to cook eggs in their rooms. Doc.

___

[4] The Court recognizes that a store engaged in trafficking could also obtain cash through other means. For instance, a drug dealer could bring cash into the store to be laundered through fraudulent EBT transactions. The Court further recognizes that the United States has no obligation to identify the source of cash. Nonetheless, the United States' only witness posited that the store obtained cash through legitimate sales and so the Court points out the inconsistency between this theory and the theory that the size of the store would not support this amount of cash transactions.

133 at 141:24-142:3. Granted, most of the items purchased from the Dollar Store and Sam's Club consisted of candy bars, drinks, and other snacks Four Winds indisputably sold at its store. Four Winds, however, presented no evidence at trial that it resold certain items listed on the Dollar Store and Sam's Club receipts at its store.[5] No accounting exists that matches items bought from the Dollar Store and Sam's Club to inventory sold at the Four Winds store. At best, the Court can conclude that *some* food items purchased at the Dollar Store and Sam's Club were the same type of food items listed as inventory at the Four Winds store.

Simply put, Four Winds made no attempt to provide an analysis of the data contained in the administrative record. In addition to presenting no forensic accounting to demonstrate that the store's items purchased matched its items sold, it presented no summary of the underlying data to show that the United States' concerns about same-cents transactions can be explained by its same-cents pricing structure. Nor did Four Winds make a timely attempt to disclose documentary evidence not already part of the administrative record. For instance, although Four Winds has access to the exact items comprising purchases the United States has identified as suspicious, Four Winds chose to not present this information as part of its case.[6]

---

[5] During his testimony, Mr. Reincke asked rhetorically, "If the receipts are not proof of a transaction, Your Honor, I don't know what is. Why would I continue to buy something if I wasn't selling it?" Doc. 134 at 17:22-24. This argument (appropriate for counsel, but not a witness) does not establish that Mr. Reincke has personal knowledge that the receipts reflect purchases used for store inventory. Moreover, the point of eliciting facts, not argument, during testimony is to allow a factfinder to make decisions based on facts, not speculation. One fact we do know is that not all of the items on the receipts were sold in the store. Without evidence, the Court declines to speculate whether certain items were sold at the store, used in the kitchen, or given away as refreshments at some event.

[6] Mr. Reincke did attempt to testify about specific items purchased at the store in relation to the Suspect Transactions. Doc. 133 at 161-176. Rather than basing this testimony on his personal knowledge, however, he learned this information from records Four Winds neither provided in discovery nor listed as trial exhibits. By neither producing these records nor listing them as an exhibit, Four Winds chose not to include them as part of the evidence at trial.

And, rather than calling witnesses familiar with transactions at the store (such as store clerks, the store manager, or customers), Four Winds called three witnesses who were unfamiliar with the day-to-day operations of the store and who had no personal knowledge of any of the transactions in question. Four Winds merely elicited from its two witnesses associated with Four Winds that they were unaware of any trafficking at the Four Winds' store. But without having established that these witnesses would have been aware of trafficking at the store had it happened, their testimony fails to advance Four Winds' case.

Four Winds also introduced testimony that the Four Winds store had a camera that recorded transactions at the store. Doc. 133 at 96:2-4. Four Winds, however, did not elicit any testimony about whether the camera footage was ever reviewed and presented no evidence about what the camera footage showed. *Cf. id.*

Thus, more notable than what Four Winds presented at trial is what Four Winds did not present at trial. Instead of presenting evidence of its own, Four Winds adopted the posture of a criminal defendant, referring to itself as "the accused" and the administrative decision as the "guilty verdict," and arguing that the United States failed to establish that it engaged in fraudulent activity. *E.g.*, Doc. 134 at 24-26, 53, 84-85; Doc. 130[7] at 24. The United States, of course, points out that Four Winds is not charged with a crime; instead, Four Winds is a civil plaintiff that, like all other civil plaintiffs, carries the burden of proving its case. Doc. 131 at 22-23. This burden of proof is appropriate, the United States argues, as Four Winds is in the best position to present evidence that explains why the anomalous data associated with its store should not result in a conclusion that the store has engaged in trafficking. *Id.*

---

[7] The CM ECF headers and the internal page numbering are inconsistent in this document. The Court cites to the CM ECF headers.

As more fully set forth below, the Court agrees that Four Winds carries the burden of proof at a de novo trial. Instead of engaging in any discovery, presenting any analysis of the underlying data, or calling any witnesses with personal knowledge of day-to-day operations of the store, however, Four Winds argued that the administrative process was unfair, that it should not have to carry the burden of proof at trial, and that the United States has failed to show it has engaged in trafficking. Four Winds' arguments misapprehend the law and do nothing to prove its case.

Further, as the United States points out, an overarching trafficking scheme is not required to disqualify a store from the EBT program. One trafficking transaction alone is sufficient to support this action. In reviewing the specific transactions the United States has identified, the Court agrees that some of those transactions are suspicious and indicative of trafficking, and that Four Winds has failed to provide any evidence to allay those suspicions.

B.    Standard of Review

Under the relevant statutory and regulatory scheme, review of FNS's decision to disqualify a SNAP retailer from participating in the program is both administrative and judicial. 7 U.S.C. § 2023(a). Administratively, a store has the right to challenge FNS's decision by requesting the agency's Chief Administrative Review Branch to review the decision. AR 316. Four Winds has the opportunity to submit further evidence at this stage of the proceedings. AR 636. An Administrative Review Officer then reviews the case and issues the final agency decision. AR 643.

"[W]ithin thirty days after the date of delivery or service of the final notice" of the agency's final disqualification determination, the retailer may file a complaint in district court "requesting the court to set aside such determination." 7 U.S.C. § 2023(a)(13). The United States is the proper named defendant. 7 U.S.C. § 2023(a)(13). "The suit in the United States district

court or State court shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue . . . ." 7 U.S.C. § 2023(a)(15). Jurisdiction and venue are proper in this Court pursuant to 7 U.S.C. § 2023(a)(13).

Although FNS directed its July 2, 2018 charge letter to individuals—Michael Bryan Drennon, Garrett Kristen Reineke, and Eugene Michael Rosa, AR 129—the final agency decision addressed only the disqualification of "Four Winds Behavioral Health" from SNAP participation. AR 648.[8] "[B]ecause the Act punishes violations committed by the store, the Food and Nutrition Service's failure to identify the clerks who improperly accepted the food stamps is irrelevant." *Wolf v. United States*, 662 F.2d 676, 678 (10th Cir. 1981). In other words, disqualification of the Four Winds store from the EBT program does not require a demonstration that any particular person engaged in trafficking.

Despite review of the disqualification decision being de novo, the agency's choice of sanctions is subject to arbitrary and capricious review. *Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 820 (10th Cir. 1991); *Joudeh v. United States*, 783 F.2d 176, 178 (10th Cir. 1986). As the First Circuit has explained: "If the court upholds the agency's finding of a violation, the court's only remaining task is to examine the sanction imposed in light of the administrative record to judge whether the agency properly applied its regulations, i.e., whether the sanction is warranted in law or without justification in fact." *Broad St. Food Mkt. v. United States*, 720 F.2d 717, 720

---

[8] In addition, as the Court noted at trial, these individuals are not parties in this case. Doc. 134 at 53:5-6. The individuals were removed from this case when the Amended Complaint dropped them as parties. Doc. 35. Ms. Torres testified that the agency finding of trafficking "is a finding against the three individual owners" because they signed the application for SNAP benefits and agreed to be held liable. Doc. 134 at 84:2-19, 85:15-18. In this de novo trial, however, the Court does not find or conclude that these individuals engaged in or condoned trafficking. The Court finds only that Plaintiff Four Winds has not met its burden to show that the agency decision is invalid.

(1st Cir. 1983) (internal quotation marks and alterations omitted). Other courts have described this as a "bifurcated review standard." *Colorado v. United States*, No. 07-cv-936, 2008 WL 2690710, at *2 (D. Colo. July 2, 2008).

The Tenth Circuit has yet to provide guidance on which party carries the burden of proof at the de novo trial. But every circuit to consider the matter has held that the burden of proof is "placed upon the store owner to prove by a preponderance of the evidence that the violations did not occur." *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997); *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018); *Fells v. United States*, 627 F.3d 1250, 1253-54 (7th Cir. 2010); *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir. 1986); *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991); *Goodman v. United States*, 518 F.2d 505, 507 (5th Cir. 1975); *Redmond v. United States*, 507 F.2d 1007, 1011-12 (5th Cir. 1975); *cf. Idias v. United States*, 359 F.3d 695 (4th Cir. 2004) (upholding summary judgment in the United States' favor where "the United States had presented a prima facie case that Idias had trafficked in food stamps"; "FNS had detected a pattern of suspicious activity in Idias's store"; and "Idias was at a loss to explain these discrepancies to the district court").

Four Winds objects to this standard of review as incomprehensible, unconstitutionally vague, and unfair. Doc. 130 at 17-18. Four Winds' objections are primarily based on its contention that this standard of review is an impossible burden to meet. Doc. 132 at 1-2. The Court is sympathetic to Four Winds' argument that essentially proving its innocence can be challenging. But the Court gave Four Winds a road map as to the sort of evidence it would be persuaded by at a de novo trial. Doc. 81. As the operator of its store, Four Winds is in possession of evidence about its pricing structure, inventory, sales, unique characteristics, and operation. If Four Winds did not engage in trafficking, it could have used this evidence to meet its burden of

proof and to rebut the United States' case, which was based on inferences drawn from what it deemed suspicious transactions at the store. Four Winds, however, did not do so.

As *Redmond* explained:

> [B]y requiring the aggrieved store to file a complaint in the district court requesting the court to set aside the agency determination, the Act casts the burden of being the plaintiff on the aggrieved store with all of the usual responsibilities of a plaintiff in obtaining relief from a court, including the burden of proving facts to show that he is entitled to relief. In other words, the agency action stands, unless the plaintiff proves that it should be set aside. He may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency, and the agency itself may offer any evidence available to support its action, whether or not in the administrative record. But unless proven to be invalid, the agency action prevails.

507 F.2d at 1011-12. The Court therefore rejects Four Winds' argument that it should not carry the burden of proof and instead chooses to follow the opinion of every circuit court to address the matter. The burden of proof is placed upon the store owner to prove by a preponderance of the evidence that the violations did not occur.

C.    Suspicious Transactions

The United States observes that "the statute requires permanent disqualification on 'the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store.'" Doc. 131 at 2 (quoting 7 U.S.C. § 2021(b)(3)(B)). Therefore, the United States argues, "Four Winds has the burden of demonstrating that *each transaction* deemed suspicious was in fact legitimate." *Id.* (citing *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000), and *McClain's Mkt. v. United States*, 214 F. App'x 502, 505 (6th Cir. 2006)). Four Winds argues that this requirement would be absurd. Doc. 132 at 2. The Court does not need to decide this exact issue for purposes of this case. The United States identified a finite number of suspicious transactions and narrowed its case to focus on a handful of them. *E.g.*, Doc. 118 at 9-10. The Court does not necessarily find

that Four Winds needed to address the thousands of transactions in the Attachments to the charge letter. The Court does find, however, that Four Winds could easily have investigated the handful of transactions the United States focused on pretrial and presented evidence about these transactions at trial.

For example, the United States highlighted a series of transactions on Friday, April 6, 2018, in which one household purchased $239.30 at 5:24 p.m. The household returned at 6:56 p.m. and purchased an additional $37.25 worth of items. The household returned at 7:37 p.m. to make a $42.50 purchase, followed by a fourth purchase of $21.80 at 8:30 p.m. Over the course of three hours and six minutes, the household spent a total of $340.85 at this small convenience store. The United States emphasized this series of transactions in its summary judgment brief, in its pretrial brief, and presented testimony about these transactions at trial. Doc. 55 at 6, 7, 16; Doc. 118 at 9; Doc. 134 at 151-52. This series of repeat transactions is similar to other repeat transactions the United States argued are indicative of trafficking. Doc. 55 at 6-7.

With regard to *any* of the transactions the United States identified as being indicative of trafficking, Four Winds has failed to introduce any evidence whatsoever. Four Winds did not present testimony from the store clerk who processed these transactions or from some other employee who reconciled the transactions with the store's inventory or cash receipts. It did not call as a witness the resident who engaged in these transactions. Nor did Four Winds present expert testimony from an accountant who might have reconciled the store's reported sales with the store's reported inventory. As such, Four Winds also failed to submit any documentary evidence, such as store receipts from its point-of-sale system that would have established the content of the items sold during the high-dollar and repeat transactions in question. Four Winds' trial witness, Mr. Reincke, testified that such information existed. Doc. 133 at 79:1-8, 162:23-

163:4. Despite having these records available, Four Winds' decision not to disclose them or list them as exhibits prevented Four Winds from being able to present their content as evidence. Four Winds' counsel implicitly acknowledged as much when he stated on the record that he was not moving to admit the receipts as evidence. Doc. 134 at 66:9-19, 67:11-14.

Instead of presenting evidence, Four Winds argued that it was the agency's burden to request the point-of-sale receipts. Doc. 66:13-67:14. This is not true. Four Winds has the burden in this de novo proceeding to rebut the United States' prima facie case and Four Winds failed to present evidence to meet that burden. Four Winds did argue in closing argument that the store's weekly restocking explains the large transactions. Doc. 130 at 25. But argument is not evidence and Four Winds' failure to present evidence on the point renders its argument hollow.

D.     Four Winds' Failure to Present Evidence

In short, Four Winds' argument that it is unfair to require it to demonstrate it did not engage in trafficking is undermined by Four Winds' failure to present evidence within its control. This is particularly true given that the Court's Order denying the United States' motion for summary judgment provided numerous examples of useful ways the underlying data could be analyzed. Doc. 81 at 18-28. In denying the United States' motion for summary judgment the Court drew all reasonable inferences in favor of Four Winds (the non-moving party) and, when doing so, concluded that a reasonable factfinder could find in Four Winds' favor at trial. In other words, the Court decided that Four Winds should be allowed to present facts at trial to support the inferences the Court drew in Four Winds' favor at the summary judgment stage. Four Winds, however, presented scant evidence or argument in support of the inferences the Court found could be reasonable. Despite knowing in advance that the Court would not credit hearsay in the Administrative Record at trial, Doc. 140 at 71-73, Four Winds failed to present evidence or argument at trial regarding the possible explanations for the Suspect Transactions that Four

Winds presented to the agency and that the Court examined in its summary judgment opinion. AR 166-167, 169, 170, 319-325.

In conclusion, Four Winds did not meet its burden to prove, by a preponderance of the evidence, that the trafficking violations did not occur.

E.    Miscellaneous Matters

1)    The United States' Rule 52(c) Motion

After the close of Four Winds' case, the United States presented a Rule 52(c) motion that the Court took under advisement. Doc. 134 at 109:11-110:14. In light of the findings and conclusions set forth above, the Court grants this motion. Four Winds' failure to present evidence in its case-in-chief entitled the United States to judgment as a matter of law.

Although granting this motion is alone sufficient to resolve this case, because the Court heard testimony from the United States, the Court alternatively would enter judgment in the United States' favor even in the absence of the Rule 52(c) motion. This is because the scant evidence Four Winds presented failed to meet its burden to rebut the inference of trafficking and, considering the evidence the United States presented (although also minimal), the Court agrees that the suspicious repeat transactions the United States identified provide by more than a preponderance of the evidence that those transactions involved trafficking.

2)    Four Winds May Proffer For the Record the Contents of Testimony the Court Excluded From Trial

Per the request of counsel for Four Winds at trial, the Court will permit Four Winds to file a proffer regarding the contents of the testimony excluded from trial. Doc. 134 at 94:7-8, 107:5-109:3. The deadline to submit this proffer is 21 days from the date of this Order.

### 3) Four Winds' Belated Appointments Clause Challenge

On February 4, 2021, this Court ruled, analogizing to precedent from the Tenth Circuit regarding social security cases, that constitutional Appointments Clause challenges to AROs must be administratively exhausted. Doc. 114 at 4-6 (citing *Carr v. Commissioner*, 961 F.3d 1267 (10th Cir. 2020)). The United States Supreme Court granted certiorari in *Carr* and subsequently reversed. *Carr v. Saul*, 141 S. Ct. 1352 (2021). As a result, the Court vacates the portion of its February 4 memorandum opinion that relied on *Carr v. Commissioner*. However, the Court will not reconsider the ruling itself because the opinion contained an alternative basis for precluding Four Winds from raising an Appointments Clause argument at trial: the claim was not in the operative complaint, and Four Winds' motion to amend the pleadings, on the eve of trial, was untimely. Doc. 114 at 2-4.

At the pretrial conference, the Court pointed out that when Four Winds filed its Amended Complaint, it affirmatively removed the Appointment Clause language that was in its original Complaint. Doc. 140 at 16-17. The Court then stated: "I can see why the Government would be under the impression that the removal of that language from one complaint to the next would indicate that the Plaintiff no longer intended to pursue that Appointments Clause issue. And part of my concern in this case is that . . . Plaintiff knew about the issue. Plaintiff raised the issue in the original complaint. And so the question for me is, why did the Plaintiff wait until after the discovery period to then renew any Appointments Clause challenge and is it too late to do so now?" Doc. 140 at 16:20-21, 17:1-6. As the Court ultimately ruled in its written opinion, the request to amend the complaint on the eve of trial required Four Winds to show "good cause" under Rule 16 for modifying the scheduling order. Doc. 114 at 3 (citing *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1241 (10th Cir. 2014)). Four Winds' assertion of good cause relied on a mistake of law: counsel thought it was sufficient to include an issue in the

original complaint and it did not need to be reasserted in the amended pleading. Doc. 140 at 30:8-13. In addition, counsel asserted that there was no prejudice or surprise to the United States in allowing the amendment and the United States did not need discovery on the claim because all the relevant facts were in its possession. *Id.* at 31:13-23, 33:13-34:10.

The proposed amendment was untimely and "untimeliness alone is a sufficient reason to deny leave to amend." *Frank v. U.S. West, Inc*., 3 F.3d 1357, 1365 (10th Cir. 1993). "Furthermore, where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." *Id.* (internal alterations and quotation marks omitted). Four Winds knew of its Appointment Clause challenge from the beginning and its only explanation for removing the issue from the case and waiting so long to move to re-amend was based on a mistake of law. As the Court explained in its Order disallowing the amendment, a mistake of law by counsel is not good cause. Doc. 114 at 4 (citing *Broitman v. Kirkland* (*In re Kirkland*), 86 F.3d 172, 175 (10th Cir. 1996)).

In addition, the Court found the United States would have been prejudiced by the amendment because it had no opportunity to take discovery on the issue, move to dismiss the claim in the complaint, or move for summary judgment on the claim. *Id.* at 3-4. To be clear, the Court agrees with Four Winds that the United States did not assert any specific discovery it would have needed to conduct on this issue. However, the United States argued that "it's not our obligation to prove or disprove a claim that hasn't been made." Doc. 140 at 40:16-17. This is the crux of the issue: had the issue been in the complaint, the United States could have moved for summary judgment because it was *Four Winds'* burden to develop facts in discovery and present them in summary judgment practice. Instead, the United States moved for summary judgment on

the only claim in the complaint: a plea for reversal of the administrative decision below. Doc. 55. The Appointments Clause challenge was raised by Four Winds as grounds to oppose the motion, Doc. 60 at 2-3, and the Court found Four Winds presented no facts supporting such a challenge, Doc. 81 at 29-31. The Court would have granted a motion for summary judgment on the Appointments Clause challenge, had the issue been in the complaint and had the United States brought such a motion, because it was clear that Four Winds lacked the facts necessary to avoid summary judgment on the issue. *Id.* Four Winds straightforwardly acknowledged as much. Doc. 60 at 6-7; *see also* Doc. 67 at 6 ("The challenge as to Proulx requires much more information than we have at present."); Doc. 73 at 5. In other words, the prejudice of waiting to raise the issue on the eve of trial is that the United States was deprived of the pretrial opportunity to demand Four Winds present facts showing a material issue of fact on which to proceed to trial.

In addition to observing that Four Winds lacked facts to state an Appointments Clause challenge at the summary judgment stage, the Court notes that Four Winds was not prepared to present any relevant facts at trial either. Four Winds listed two witnesses for trial: Ms. Bachelor-Evridge and Mr. Reincke. Doc. 109 at 1-2. Four Winds admitted that neither witness had information about the Appointments Clause challenge. Doc. 140 at 41:13-20. Four Winds also included Ms. Torres on its witness list for "cross examination." Doc. 109 at 1. The description of her testimony did not include any information on the Appointments Clause issue. *Id.* At the pretrial conference, Four Winds' counsel explained that "My efforts to talk about Appointments Clause issues would be in cross examination of Ms. Torres and just point out through that cross examination all of the holes that exist in the process." Doc. 140 at 42:2-5. As the Court ruled earlier, as plaintiff, Four Winds had the burden of proof on all matters at trial. Cross-examination of Ms. Torres to point out missing evidence, or "holes," would not have satisfied this burden.

Thus, the Court additionally rules that permitting the amendment to the complaint to add the Appointments Clause challenge would have been futile because Four Winds did not put the United States on prior notice that any information on the topic would be elicited from the United States' witness at trial and did not name any witnesses who could have satisfied its burden of proof on the issue at trial.

Counsel for Four Winds explained during the pretrial conference that by placing Ms. Torres on his witness list for "cross-examination" he meant that he intended to call her in his case-in-chief and then "cross-examine" her as a hostile witness; in other words, he intended to conduct her direct exam through the use of leading questions. Doc. 140 at 43:22-25. There are at least two problems with this. First, regardless of the intent of Four Winds' counsel, listing Ms. Torres as a witness for "cross-examination" provided no advance notice to the United States or the Court that Four Winds intended to call Ms. Torres as a witness in its case-in-chief. Second, in describing Ms. Torres' expected testimony, Four Winds never provided notice that it intended to elicit information from Ms. Torres in support of an Appointments Clause challenge (that was not even part of the operative complaint). *See id*. at 43:4-18. Thus, even if the Court would have granted Four Winds' eleventh hour motion to re-amend its complaint re-include an Appointments Clause challenge, Four Winds' failure to timely notify the United States or the Court that it intended to elicit Appointments Clause testimony from Ms. Torres would have resulted in the exclusion of this testimony from Ms. Torres. This exclusion would have then left Four Winds with no means to establish the facts necessary to support an Appointments Clause challenge.

4)  Four Winds' Proposed Findings of Fact

Four Winds submitted its proposed findings of fact on March 29, 2021. Doc. 137. On March 30, Four Winds filed a revised set of proposed findings of fact that also included

conclusions of law. Doc. 138. The Court treats the revised findings and conclusions as the operative submission. The United States objected to Four Winds' proposed findings on April 5. Doc. 139. The United States argues that Four Winds' proposed findings "rely on documents not in evidence, present legal argument as factual findings, raise new constitutional claims not included in the Amended Complaint, and press claims regarding the underlying proceedings that the Court has already ruled are irrelevant." Doc. 139 at 1. The Court need not, however, strike Four Winds' proposed findings. To the extent Four Winds raised relevant arguments in its proposed findings, the Court considered them in the course of issuing the present Findings of Fact and Conclusions of Law. To the extent Four Winds raised matters excluded from trial by the Court's rulings on motions in limine, or raised new arguments or presented new evidence after the conclusion of trial, the Court has not considered them. *See Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993) (issues raised for the first time after trial are forfeited); *see also Daniels v. Bd. of Educ. of Ravenna City Sch. Dist.*, 805 F.2d 203, 210 (6th Cir. 1986) (the district court did not abuse its discretion in declining to allow party to pursue theories not addressed in its pretrial order but raised for the first time in proposed findings of fact and conclusions of law after trial); *N. Point Trawlers, Inc. v. Streater*, 212 F. App'x 907, 908 (11th Cir. 2006) ("filing Proposed Conclusions of Law after the bench trial" was "too late to raise a new legal issue for the first time").

A contemporaneous form of judgment will be entered separately under Rule 58.


STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by consent